804 So.2d 247 (1999)
John Milton HARDY
v.
STATE.
CR-95-0589.
Court of Criminal Appeals of Alabama.
March 26, 1999.
Rehearing Denied June 18, 1999.
*254 Donald Alan Chapman, Decatur; James Ralph Mason, Jr., Decatur; and John Edmond Mays, Decatur, for appellant.
Bill Pryor, atty. gen., and Michael B. Billingsley, asst. atty. gen., for appellee.
PATTERSON, Retired Appellate Judge.
The appellant, John Milton Hardy,[1] was jointly indicted with Ulysses Charles Sneed on October 22, 1993, in Morgan County, for the capital offense of murder committed during a robbery in the first degree. See Ala.Code 1975, § 13A-5-40(a)(2).
At arraignment, Hardy pleaded not guilty and not guilty by reason of mental disease or defect. Before trial, he withdrew his plea of not guilty by reason of mental disease or defect. On October 27, 1995, after Hardy was jointly tried with Sneed, a jury found Hardy (as well as Sneed) guilty of the capital offense charged in the indictment. On October 30, 1995, after a joint sentencing hearing before the jury, § 13A-5-46, the jury recommended, by a vote of 10-2, that Hardy (and Sneed) be sentenced to death. On December 21, 1995, the trial court held another joint sentencing hearing, § 13A-5-47, and heard arguments concerning information in the presentence investigation report and concerning the existence of aggravating circumstances and mitigating circumstances. Thereafter the trial court determined that two aggravating circumstances *255 existed in regard to Hardy: (1) that the murder was committed during the course of a robbery, § 13A-5-49(4); and (2) that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A-5-49(8). The court determined that two statutory mitigating circumstances existed: (1) that Hardy had no significant history of prior criminal activity, § 13A-5-51(1); and (2) that Hardy's age (22 years old) at the time of the crime, § 13A-5-51(7).[2] The court further determined that one nonstatutory mitigating circumstance existed: that Hardy had a family, i.e, his mother, father, and four siblings; it rejected the proposed nonstatutory mitigating circumstance regarding Hardy's character. Based upon the evidence presented at trial, the evidence presented during the sentencing hearings, the presentence investigation report, the recommendation of the jury, and its finding that the aggravating circumstances outweighed the mitigating circumstances, the trial court sentenced Hardy to death. See § 13A-5-47. (Sneed was also sentenced to death.)
The state's evidence showed the following. In the early morning hours of September 7, 1993, Clarence Nugene Terry, the clerk at a Bud's Convenience Store located in Decatur, was murdered and robbed. A surveillance camera captured the entire robbery-murder on videotape, and the videotape was recovered at the scene. The videotape showed that Hardy and Sneed entered the store and that Hardy was armed with a gun. Immediately upon entering the store, Hardy began shooting at Terry. As Hardy fired the initial shot, Sneed walked past Hardy toward the cash registers. The first shot missed Terry, and he ran behind the counter, trying to hide. Sneed, by this time also behind the counter, tried to open the cash registers as Terry lay on the floor near Sneed's feet. As Sneed attempted to open the cash registers, Hardy, who was still in front of the counter, leaned over the counter and shot Terry in the chest. Terry tried to protect and hide himself after this shot. Hardy walked around the counter, and while standing over Terry, fired five shots into Terry's face and head. Forensic evidence showed that Terry was still conscious when Hardy began shooting him in the head. Terry suffered gunshot wounds to the left cheek, left upper cheek, center of his forehead, left ear, left eye socket, right side of his chest, and the palm of his right hand. Any of the wounds to the head or the one to the chest would have proved fatal. As Terry lay dying on the floor, Sneed and Hardy continued their attempts to open the cash registers. Sneed, at one point, kicked Terry's foot to move it out of his way. The attempts to open the cash registers were unsuccessful, so Hardy and Sneed unplugged one of the cash registers and took it with them when they ran out of the store.
The state's evidence further showed that on August 29, 1993, a few days before the robbery-murder, Sneed and Christopher Hines drove in Hines's blue 1978 Ford automobile from Louisville, Kentucky, to Tanner, Alabama, to visit Hines's relatives. Sometime after arriving in Tanner, Hines introduced Sneed to Hardy. On the evening of September 6, 1993 (the evening before the early-morning crime), Hardy, Sneed, and Hines rode in someone else's automobile to Tennessee to purchase fireworks *256 and beer. They returned to Alabama, where they spent the remainder of the evening drinking. Around 10:30 p.m., Hines let Hardy borrow his automobile; Sneed left with Hardy. Hines did not see either Hardy or Sneed until around 3:00 or 4:00 a.m. the next morning, when he accompanied them to a location near Hardy's father's house, where, using a sledgehammer, the three men attempted to get money out of a cash register. Subsequently, the cash register was identified as the one taken during the robbery-murder, and Hines's fingerprint was later found on a piece of the cash register that was recovered. Sometime later that day Hardy, Sneed, and Hines returned to Hardy's father's house, where Hardy and his father had an argument about a gun; Hardy's father accused him of stealing the gun.
The state's evidence also showed that police officers showed the surveillance videotape of the robbery-murder to several persons, including Hines, in an effort to identify the gunman and his accomplice. Hines and three others positively identified Hardy as the shooter. Sneed was identified as the accomplice appearing on the videotape.
On Wednesday, September 8, 1993, Hardy, Sneed, and Hines traveled to Louisville, Kentucky. Hardy was arrested in Kentucky the same day. At the time of his arrest, he was carrying a 9mm semiautomatic handgun. While in custody in Kentucky, Hardy gave an oral statement to the Decatur, Alabama, officers, denying his involvement in the crime; however, he admitted borrowing Hines's automobile on September 6. Also, when asked how much money he "got," he replied that he did not get any because he could not get the cash register open. He further stated the he had hidden the gun, wrapped in plastic, in the attic at his father's house in Alabama; that the clothes, presumably those worn during the crime, had been burned; and that the cash register had been thrown away. He stated that when he was returned to Alabama, he would consent to a search and would show the officers where the gun was located.
Hardy appeared before a judge, waived extradition, and was returned to Alabama. Upon arrival at his father's house, Hardy signed a consent-to-search form. The officers did not find the gun. When asked about it, Hardy stated that he did not know what the officers were talking about and that he had told the officers about a gun just so he could return to Alabama. He further stated that he knew nothing about any burned clothes. There was a smoldering fire in the backyard, but the officers could not determine what had been burned.
Hardy relied on an alibi defense, arguing that the identification witnesses were mistaken and that he knew nothing about the crime. He presented two alibi witnesses: his brother, who testified that Hardy was home on the night of the crime and that it was not Hardy on the videotape; and his sister, who also testified that it was not Hardy on the videotape. He presented several character witnesses at the sentencing phase before the jury. He did not testify at either the guilt or sentencing phases of the trial.
Hardy does not question on appeal the sufficiency of the evidence to support his conviction for the capital offense charged, and, from our review of the record, the evidence of guilt is overwhelming. We conclude that the evidence presented by the state was sufficient for the jury to find Hardy guilty, beyond a reasonable doubt, of the capital offense chargedmurder committed during a robbery in the first degree.

*257 I.
Hardy contends that the "joinder of [his] trial with his codefendant's violated [his] rights, and the trial court's refusal to grant a severance was reversible error." The joint indictment of Hardy and Sneed was proper because two or more defendants may be charged in the same indictment if they are alleged to have participated in the same act or transaction. Ala. R.Crim.P. 13.3(b)(1). Here, Hardy and Sneed were charged with participation in the same act or transaction. Defendants joined in the same indictment shall be jointly tried unless severed as provided in Rule 13.4. If it appears that a defendant is prejudiced by such a joinder, the trial court may grant a severance or provide whatever other relief justice requires. Rule 13.4(a). The rule makes no distinction between capital and noncapital offenses. See Rogers v. State, 630 So.2d 78 (Ala.Crim.App.1991), rev'd, 630 So.2d 88 (Ala.1992), aff'd on remand sub nom. Musgrove v. State, 638 So.2d 1347 (Ala. Crim.App.1992), aff'd, 638 So.2d 1360 (Ala. 1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994); Hinton v. State, 548 So.2d 547 (Ala.Crim.App.1988), aff'd, 548 So.2d 562 (Ala.), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). The Alabama rule pertaining to joinder and severance is taken from the federal rule. Fed.R.Crim.P. 14. See also Hinton v. State, 548 So.2d at 555.
Hardy, by a timely filed pretrial motion, moved for a severance, claiming that he was not involved in the crime; that Sneed had confessed and had implicated Hardy in the crime; that his and Sneed's defenses were antagonistic to the point of being irreconcilable and mutually exclusive; and that, for the jury to believe him, it must disbelieve Sneed. At a pretrial hearing, the trial court denied Hardy's motion to sever, finding, among other things, as follows:
"Defendant's counsel do not assert that the defendant and co-defendant have irreconcilable and mutually exclusive defenses. Specifically, the defendant asserts he was in another state at the time of the alleged offense and did not participate with the co-defendant in causing the death of the deceased. The defendant asserts the co-defendant has given a statement implicating himself and the defendant in the alleged offense and that the co-defendant is attempting to protect a third person by implicating the defendant.
"The court has weighed the inconvenience and expense to the state of separate trials against any possible prejudice to this defendant. The court has also considered the possibility of the admission of the defendant ... Sneed's statement into evidence. Should Mr. Sneed not testify in the case, and should his statement, or any portion thereof, be offered and admitted into evidence, any portions specifically referring to defendant Hardy shall be redacted. Given the protections afforded the defendant under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 ... (1968), and its progeny, as well as the court's belief that under all the circumstances as a practical matter it is within the capacity of the jurors to follow the court's instructions and to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, the defendant's motion for severance is DENIED."
(C.R.198.)
Hardy renewed his motion for a severance several times during the trial. Each time, the motion was denied.
Weighing against severance is a preference for joint trials where joint crimes are involved. Zafiro v. United States, 506 *258 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). The United States Supreme Court stated the policy in Richardson v. Marsh, 481 U.S. 200, 210, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), as follows:
"It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."
(Footnotes omitted.)
In Hill v. State, 481 So.2d 419, 424 (Ala.Crim.App.1985), we stated:
"The decision whether to grant a severance, or order a joinder of defendants, lies within the broad discretion of the trial court. This Court will not overturn that decision absent an abuse of discretion. United States v. Webster, 734 F.2d 1048, 1052 (5th Cir.), cert. denied sub nom. Hoskins v. United States, 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). `In order to establish an abuse of discretion, the defendant must show that he "received an unfair trial and suffered compelling prejudice against which the trial court was unable to afford protection." See U.S. v. Berkowitz, 662 F.2d [1127] at 1132 [(5th Cir. 1981)].' [United States v.] Webster, 734 F.2d [1048] at 1052 [ (5th Cir.), cert. denied, 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984) ].
"`When codefendants allege antagonistic defenses as a ground for severance, this Court has applied very specific tests to determine whether the trial was unfair. To compel severance, the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. See, United States v. Berkowitz, 662 F.2d [1127] at 1132 [ (5th Cir.) ]. The defenses must be so antagonistic that the jury, in order to believe the defense of one defendant, must necessarily disbelieve the other defendant's defenses. Id.' Webster, 734 F.2d at 1053.
". . . .
"We agree that, `antagonistic defenses do not per se require severance, even if the defendants are hostile or attempt to cast the blame on each other.' United States v. Arruda, 715 F.2d 671, 679 (1st Cir.1983). `Antagonism of defenses requires severance only where the defenses are so inconsistent that the jury would have to believe one defendant at the expense of the other; the conflict alone establishes the guilt of a defendant.' United States v. Drougas, 748 F.2d 8, 20 (1st Cir.1984). `[S]everance is required because of "mutually antagonistic defenses" only when the defenses are so antagonistic that "the acceptance of one party's defense will preclude the acquittal of the other."' United States v. Hendrix, 752 F.2d 1226, 1232 (7th Cir.), cert. denied sub nom. Merritt v. United States, 471 U.S. 1021, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985)."
See Ex parte Washington, 562 So.2d 1304, 1305-06 (Ala.1990); Greathouse v. State, 624 So.2d 202 (Ala.Crim.App.1992), aff'd, 624 So.2d 208 (Ala.1993).
*259 In Greathouse v. State, 624 So.2d at 205, we stated:
"`Even if defendants attempt to cast blame on each other, severance is not necessarily required.' United States v. Arthur, 949 F.2d 211, 217-18 (6th Cir. 1991). `The burden is on defendants to show that an antagonistic defense would present a conflict "so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." United States v. Davis, 623 F.2d 188, 194-95 (1st Cir.1980)...' United States v. Warner, 971 F.2d 1189, 1196 (6th Cir.1992). See also United States v. Crotinger, 928 F.2d 203, 206 (6th Cir. 1991). `The so-called "doctrine of antagonistic defenses" is a narrow one. See [United States v. Manner, 887 F.2d 317, 326 (D.C.Cir.1989), cert. denied, 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990) ]. It applies only when "`there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty'"; it does not apply when "independent evidence of each defendant's guilt supports the jury's verdict." United States v. Leonard, 494 F.2d 955, 966 (D.C.Cir.1974) (citation omitted and emphasis added in Leonard).' United States v. Harrison, 931 F.2d 65, 71 n. 8 (D.C.Cir.), cert. denied, 502 U.S. 953, 112 S.Ct. 408, 116 L.Ed.2d 356 (1991)."
A defendant seeking to overturn a denial of a motion for severance has the burden of demonstrating specific and compelling prejudice that the trial court cannot protect against and that will cause the defendant to receive an unfair trial. The defendant must demonstrate that the prejudice is specific and that it resulted from the denial. A demonstration of some prejudice is insufficient. Minnis v. State, 690 So.2d 521 (Ala.Crim.App.1996). In order to justify a severance, a defendant must show before or during the trial that there was a serious risk that his rights would be compromised, or that severance was necessary for the jury to make a reliable judgment. Zafiro v. United States, 506 U.S. at 539, 113 S.Ct. 933. He must show more than that he was tried with a codefendant whose strategy was generally antagonistic to his. United States v. Brown, 16 F.3d 423 (D.C.Cir.), cert. denied, 513 U.S. 900, 115 S.Ct. 257, 130 L.Ed.2d 178 (1994). The test of whether a severance should be granted on the grounds of prejudice is whether, under all the circumstances, as a practical matter, it is within the capacity of the jurors to follow the court's instructions and to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts. Holsemback v. State, 443 So.2d 1371 (Ala. Crim.App.1983).
Hardy argues that the trial court abused its discretion in denying his motion for severance because, he says, his and Sneed's defenses were antagonistic to the point of being irreconcilable and mutually exclusive, and because the admission of Sneed's inculpatory post-arrest statement violated his rights under the Confrontation Clause of the Sixth Amendment. He further argues, in effect, that Sneed's counsel made comments in closing argument that were prejudicial to him; that demonstrate his and Sneed's antagonistic and mutually exclusive defenses; and that impermissibly connected or linked him with Sneed's statement, thus nullifying the purpose of the redaction of the statement. On the other hand, the state argues that the defenses were not so antagonistic as to be irreconcilable and mutually exclusive; that Hardy failed to meet his burden of showing compelling prejudice that would warrant a severance; that the comments of Sneed's trial counsel in closing arguments *260 and the testimony elicited from witnesses on cross-examination were "minor" and "insignificant" and did not rise to the level of compelling prejudice; and that, even if the comments and testimony elicited were improper and erroneously admitted, in light of the substantial and overwhelming independent evidence of Hardy's guilt, they were harmless.
Hardy's defense was that he was not present when the crime was committed and that he had no knowledge of it. He attempted, through alibi witnesses, to show that he was at home when the crime was committed, and he presented witnesses who testified that he was not one of the people committing the crime shown in the surveillance camera videotape. Sneed's defense was that he participated in the robbery part of the crime, but not the murder; that he was one of the people in the videotape but not the gunman; and that he did not intend that anyone be killed. He called no witness in his defense and did not testify himself. Rather, his defense was presented by his counsel through argument and cross-examination of witnesses.
It is obvious that the defenses are not incompatible or so antagonistic that the acceptance of one party's defense would preclude the acquittal of the other. The defenses are not so irreconcilable that it could be reasonably inferred that the differences in them alone would demonstrate that both are guilty. Hardy has not shown that he could have been acquitted only if Sneed's defense was rejected, nor has he shown that he would have been convicted only if Sneed's defense was accepted. His defense clearly did not depend on Sneed's conviction. The evidence that resulted in Hardy's conviction came from state witnesses, not from Sneed, whose redacted statement made no reference to Hardy. We agree with the findings of the trial court that the defenses were not so antagonistic as to be irreconcilable and mutually exclusive.
In reference to Hardy's contention that his rights under the Confrontation Clause were violated by the admission in evidence of Sneed's post-arrest statement, we agree that under some circumstances admission of a nontestifying codefendant's post-arrest statement can create a serious confrontation problem requiring reversal. However, those circumstances do not exist here.
The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right to confront hostile witnesses at his criminal trial. Cumbie v. Singletary, 991 F.2d 715 (11th Cir.), cert. denied, 510 U.S. 1031, 114 S.Ct. 650, 126 L.Ed.2d 608 (1993); U.S. Const.Amend. VI. This right extends to state prosecutions through the Due Process Clause of the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The admission of a nontestifying codefendant's confession at a joint trial violates the defendant's right to confrontation if the confession expressly incriminates the defendant. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Under such circumstances, an instruction that the jury shall disregard the confession as evidence against the defendant is insufficient to render it admissible, id. at 137, 88 S.Ct. 1620, unless the confession is redacted to eliminate all references to the defendant or his participation in the crime. Richardson v. Marsh, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); United States v. Petit, 841 F.2d 1546 (11th Cir.), cert. denied, 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988); Bird v. State, 594 So.2d 644 (Ala. Crim.App.1990), rev'd on other ground, 594 So.2d 676 (Ala.1991).
*261 In this case, the trial court redacted Sneed's post-arrest statement to eliminate any reference to Hardy and instructed the jury that it could consider the statement against only the person who made it Sneed. The trial court instructed the jury as follows:
"A confession made outside of court by one defendant may not be considered as evidence against the other defendant who was not present and in no way a party to the confession. Therefore, if you find that a confession was in fact voluntarily and intentionally made by Defendant Sneed, you should consider it as evidence in the case against Defendant Sneed; but you must not consider it and should disregard it in considering evidence in the case against Defendant Hardy."
(R. 3689-90.) Hardy argues, however, that testimony elicited by Sneed's counsel from certain witnesses on cross-examination and certain remarks of Sneed's counsel in closing argument rendered the redaction and limiting instructions meaningless.
Hardy contends that Sneed's counsel's closing argument emphasizing that two people were involved in the commission of the crime impermissibly implicated him as the other person in Sneed's statement. We do not agree. We also note that Hardy made no objection to Sneed's counsel's argument. There is nothing in the redacted statement to which counsel's argument can logically be tied. The jury could not have known what had been eliminated, if anything, from Sneed's statement or known that Hardy was the subject of the omitted or changed portion. The jury, of course, knew that another person was involved in the crime and, indeed, was the shooter, from the videotape and other evidence independent of Sneed's statement. Sneed's counsel's argument in this regard was not improper.
Hardy further contends that the following highlighted portion of Sneed's counsel's closing argument impermissibly linked him with Sneed's statement:
"My client is guilty of being with the wrong person at the wrong time and going in and trying to take the money, but he never, ever intended that anybody get hurt. It would be abominable for anybody to find him guilty of capital murder because he was with the wrong person at the wrong time. He was with a liar is who he was with. He was with somebody who lied, and somebody who has lied to you."

(R. 3689-90.) Hardy's counsel's objection to these remarks was sustained. No request was made for curative instructions. Again, there is nothing in the redacted statement to which counsel's argument could be logically tied. There was no basis from which the jury could infer that Hardy's role in the crime had been redacted from Sneed's statement. While we do not necessarily approve of this argument, we do not find it improper in this instance. The trial court acted to limit any prejudice to Hardy that may have resulted from the arguments of Sneed's counsel. It repeatedly instructed the jury that lawyers' statements are not evidence. Juries are presumed to follow the court's instructions. Richardson v. Marsh; United States v. Tipton, 90 F.3d 861 (4th Cir.1996), cert. denied, 520 U.S. 1253, 117 S.Ct. 2414, 138 L.Ed.2d 179 (1997); Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). After closing argument, the trial court instructed the jury as follows:
"An attorney's statements and arguments are not evidence. They are intended to help you understand the evidence *262 and apply the law; however, you should disregard any remark, statement or argument of counsel which is not supported by the evidence or by the law as given to you by the court."
(R. 3688.) In the absence of negating evidence, and we find none here, we are entitled to presume that the jury heard, understood, and followed these instructions. Even assuming, arguendo, that the remarks in question were improper, we find no error because the trial court instructed the jury that it could not consider Sneed's post-arrest statement against Hardy.
Hardy further contends that he was prejudiced by the joinder because of information elicited from certain witnesses by Sneed's counsel on cross-examination. He specifically refers to information elicited that Hardy ran with a "gang of young black males" that "caused trouble" and that he had been involved in an altercation at a nightclub shortly before the crime was committed. He also refers to questions asked on cross-examination where objections to the questions were sustained before answers were given. In this regard, he specifically refers to the question addressed to a police officer, "How is it that you know about him since you became involved in law enforcement?" (R. 3145.) Hardy's objection to this question was sustained; the question was not answered. He also refers to the question addressed to a police officer, asking if Sneed had confessed to where the gunman and his father lived. An objection to this question was sustained. These questions and answers clearly do not connect Hardy with Sneed's statement, and while they may have been questionable, they do not indicate such prejudice as would have required a severance.
The independent evidence of guilt against Hardy and against Sneed was both substantial and compelling. The nature of the charge and of the evidence is not of such a character or is not so complicated that a jury could not reasonably be expected to compartmentalize or separate the two cases and evaluate the evidence properly and individually as to each defendant. And, importantly, the trial court specifically instructed the jury to determine the guilt or innocence of each defendant by considering his own conduct and the evidence that applied to him, as follows:
"You have heard two trials presented at the same [time]. As you listen to these instructions, and as you deliberate, it is your duty to give separate, personal consideration to the cause of each individual defendant. When you do so, you must analyze what the evidence shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against the other defendant. Each defendant is entitled to have his case determined from his own acts and statements and the other evidence in the case which may be applicable to him.
"I will give you instructions specific to defendant Hardy, instructions specific to defendant Sneed and instructions that apply to both cases."
(R. 3664-65.) Again, we presume that the jury followed the court's instructions.
As we have previously stated, the burden of proof is on the defendant seeking a severance to demonstrate specific and compelling prejudice that the trial court cannot protect against and that causes the defendant to receive an unfair trial. This burden is heavy. After reviewing the record, we find no basis upon which to conclude that the trial court abused its discretion in denying Hardy's motions for severance. Hardy did not meet his burden of proof.

*263 II.
Hardy contends that the trial court denied his constitutional right to an individualized sentencing by refusing to sever his penalty phase hearing from that of Sneed. The basis of this contention is essentially that, under the circumstances, the jury would be unable to give separate, personal consideration to the sentence of each defendant and unable to base the sentence on each defendant's own acts, statements, and the evidence applicable to him. He argues that the risk of prejudice by this joinder was too great to have been alleviated by jury instructions. Section 13A-5-46(b) provides that the sentencing hearing in a death penalty case shall be conducted before the same jury that convicted the defendant, except in certain situations not present in this case. The same policy considerations that favor joint trials in the guilt phase also apply in the sentencing phase. See United States v. Tipton. See also Richardson v. Marsh; Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).
The Eighth Amendment requires an individualized sentencing determination in death penalty cases. Stringer v. Black, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The record does not support Hardy's claim that a joint sentencing hearing in this case made it impossible for the jury in this instance to render this required individualized sentencing decision as to each defendant. This was not a case in which there was considerably more aggravating evidence against one defendant than against the other. Both defendants had been indicted and convicted of the same robbery-murder. The evidence of aggravating circumstances that the state presented at the sentencing hearing was identical as to each defendant. In addition, each defendant presented mitigating evidence relevant to his character and record. Hardy's sister, Norma Jean Newton, testified at the sentencing phase before the jury that Hardy was 21 years of age when the crime was committed; that he was well liked, helpful, did not have a reputation for violence, had never committed a violent crime before this offense; and that the crime for which he was convicted was "out of character" for him. Frank D. Travis, a church youth director who became acquainted with Hardy when he was counseling other youth in the Hardy home, testified that Hardy was a "nice kid"; that he encouraged other kids to do the "right thing"; and that he was "peaceable" and not a troublemaker. David Burleson III, one of Hardy's former teachers, testified he was shocked to hear that Hardy had committed such a crime. Joe Willie Johnson, a friend and former classmate of Hardy's, testified that Hardy had a good reputation for peaceableness. Lorraine Newton Hardy, his mother, testified that he was a "good boy" and that she could not believe that he had committed the crime charged, and she recommended that his punishment be life imprisonment.
Before, during, and after closing arguments, the trial court specifically instructed the jury to give separate consideration to each defendant. The jury was informed on each occasion that each defendant was entitled to have his sentence decided on the evidence and law applicable to him and that any evidence that was limited to one defendant should not be considered as to the other defendant. In addition, counsel for the defendants, as well as the prosecutor, in their closing arguments, reiterated and emphasized the instructions of the trial court in this regard. After closing arguments in the sentencing phase, the trial court instructed the jury as follows:
"You have heard two separate sentencing hearings that were presented at *264 the same time. As you listen to these instructions and as you deliberate, it is your duty to give separate personal consideration to the sentence of each individual defendant.
"When you do so, you must analyze what the evidence shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against the other defendant.
"Each defendant is entitled to have his sentence determined from his own acts, statements and other evidence in the case, which may be applicable to him."
(R. 3887-88.) There being nothing in the record to indicate the contrary, we presume that the jury understood and followed these instructions. See Richardson v. Marsh; United States v. Tipton. We find nothing in the record that suggests that the jury was unable to weigh the evidence separately, separate the aggravating and mitigating circumstances applicable to each defendant, consider and weigh them, and render the individualized decision required. The evidence as to each defendant and the issues in the case were not complicated, were straightforward, and obviously were easily understandable.
Thus, we find no abuse of discretion by the trial court in denying the motions for severance in the penalty phase and in conducting a joint penalty-phase trial in this case.

III.
Hardy claims that the charging indictment is due to be dismissed and his conviction reversed because, he says, the method of selecting the grand jury fore-person in Morgan County is racially discriminatory. Hardy filed a pretrial motion seeking to dismiss the indictment based, in part, upon this allegation. Thereafter, the trial court held a hearing and subsequently found that no prima facie case of discrimination had been established.
This court recently addressed this issue in Drinkard v. State, 777 So.2d 225 (Ala. Crim.App.1998). The testimony elicited in Drinkard (involving the same county, the same prosecutor, and the same procedure for selecting the grand jury foreperson) is essentially identical to the testimony elicited in this case. Of particular significance, here again there is no indication in the record of the racial composition of the grand jury. We, therefore, rely on Drinkard to dispose of this issue, and hold that the trial court properly found that Hardy failed to establish a prima facie case of discrimination in the selection of the grand jury foreperson.

IV.
Hardy contends that "the trial court erred by allowing a state witness to impermissibly comment on [his] post-Miranda silence." (Appellant's brief, p. 27.) Shortly after Hardy was arrested in Kentucky, he was advised of his Miranda[3] rights by Sergeant Dwight Hale of the Decatur Police Department. He signed a form acknowledging that he understood those rights, he waived them, and he agreed to give a statement. He was questioned by Hale and Sergeant John Boyd, also of the Decatur Police Department. That statement was not recorded; however, Hale made notes of what Hardy said.
In his statement, Hardy denied involvement in the crime, but made certain damaging admissions that implicated him in it. Hale testified for the state, relating the substance of Hardy's statement. Hardy bases his contention that Hale impermissibly *265 commented on his post-Miranda silence on the following testimony:
"A. [HALE]: ... [W]e told [Hardy] that we had also found a cash register that had been recovered just a short distance from where he lived, and that some fingerprints had been lifted off of those items that were recovered. He was still crying, denying any involvement in anything.
"Then he was told that we knew he was involved, you could see him on the videotape, there was no denying it, and that if he had any kind of evidence to prove that he was not involved in anything, was not in Decatur on that night, that if he would tell us about it we would do our best to investigate it and follow up and make it known to everyone.
"Again, we told him about the tape. We told him that the vehicle, you could see Hines's vehicle at one section of the tape and it looks like a '78 Ford as it drove in front of the doors on the tape.
"Q. [PROSECUTOR]: Back up just a second, Dwight. What was his response when you told him if he had anything you could check out or investigate to indicate that he was not guilty?
"[HARDY'S COUNSEL]: We object to that. That violates our client's right of the Fifth Amendment.
"THE COURT: Sustained.
"Q. What was said or done next?
"A. Then we started to show him some photographs of the victim. He turned his head away. He was still crying. He got real agitated and acted as though he was going to jump up out of the chair. Boyd was seated to one side of the desk. I was behind it. Boyd reached around and grabbed him, and I came around the desk and grabbed him. We told him to calm down, that nobody was going to hurt him, just to calm down. Boyd had a few words with him and then Boyd left the room.
"Q. What [was] said or done next, Dwight?
"A. I sat and talked to him a few minutes to calm him down, talked to him about the crime and how horrible it was that the man was shot so many times at close range, advised him that if he was a religious person he should pray about what he had done and think about what he had done, that warrants had been issued, he had been identified and nothing was going to change anything at that point. He was still crying, sobbing. He asked me to help him or if I could help him. I told him I couldn't make him any kind of promises or any kind of deals, that just like I told him, the warrants had been issued and he would be charged with the crime, it would be left up to the courts what happened to him.
"We sat there. He got quiet for a few minutes. Two or three minutes nothing was said. I looked at him and I said, `John, how much money did you get out of the cash register?' He said, `None, we couldn't get it open.' I asked him if Hines was involved in it, that even though he wasn't on the video, if he was with him when they done the robbery, if he was just outside driving the car. He said, `No.' I asked him what happened to the gun and clothes. He said the gun was wrapped in plastic and he hid it in the attic in his father's house in Tanner. He said the clothes were burned in the backyard at his father's house.
"I asked him about the cash register. He said it was thrown away. After that, I asked him about taking down a statement, him signing a statement. He stated he wanted me to get him a Bible, that he wanted to think about it and pray about it and talk to me again later.

*266 "At that time we ended the interview and he was taken over to the Jefferson County Correctional Center."
(R. 3312-17.)
Later in the day, after the jury had been excused for the night, the record shows the following occurred:
"[HARDY'S COUNSEL]: We would move for a mistrial on the following grounds. The District Attorney phrased one of his questions earlier today in such a manner that was tantamount to a comment of the defendant....
". . . .
"[HARDY'S COUNSEL]: Failure to deny something.... We're not going to ask for a cautionary instruction. We'll just ask for a mistrial. We think the cure would be worse than the
"THE COURT: I agree. As I recall the question, it was in the course of the discussion between Mr. Hardy [and] Lieutenant Hale, and he was just reciting what was stated at the time right there when they were in Louisville. Do you know of anythingthe objection was sustained."
Thereafter, the trial court denied Hardy's motion. (R. 3377-79, 3383-83.)
Marshall v. State, 570 So.2d 832, 833-34 (Ala.Crim.App.1990) (quoting Ex parte Wiley, 516 So.2d 816, 817-18 (Ala.1987)), states:
"`Under the United States Constitution and the Constitution of the State of Alabama, an accused is guaranteed the right to remain silent. 5th Amendment, United States Constitution; Art. 1, § 6, Alabama Constitution (1901). A necessary component of the right to remain silent is that the accused's silence cannot be used against him....
"`. . . .
"`... A person may assert his constitutional rights at any time. He may answer questions if he wishes, but he may stop at any time. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 ... (1966).'"
Once a suspect knowingly and voluntarily waives his right to remain silent and has answered some questions, if he thereafter wishes to invoke his right to remain silent, he "must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." Coleman v. Singletary, 30 F.3d 1420, 1424 (11th Cir.1994), cert. denied, 514 U.S. 1086, 115 S.Ct. 1801, 131 L.Ed.2d 727 (1995). Furthermore, introducing evidence that the defendant, after Miranda warnings, elected to remain silent when confronted with accusations violates the defendant's Fifth Amendment right to remain silent and his Fifth and Fourteenth Amendment rights to due process. Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); Ex parte Johnson, 629 So.2d 619 (Ala.1993). Ex parte Harris, 387 So.2d 868, 871 (Ala.1980).
"`[W]hile it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used [against him] at trial.'

"Doyle, 426 U.S. at 617-18[, 96 S.Ct. 2240], citing United States v. Hale, 422 U.S. 171, 177, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). In Ex parte Harris, supra, at 871, this Court held that it was `fundamentally unfair and in violation of due process of law to inform a person under arrest that he has a right to remain silent and then permit an inference of *267 guilt from that silence.' See, also, Ex parte Brooks, 562 So.2d 604 (Ala.1990). `A comment is deemed to be a reference to a defendant's silence if ... the remark was of such a character that the jury would "naturally and necessarily" take it to be a comment on [the] defendant's silence.... The standard is strict; virtually any description of a defendant's silence following arrest and a Miranda warning will constitute a Doyle violation.' United States v. Rosenthal, 793 F.2d 1214, 1243 (11th Cir.1986)."
Ex parte Myers, 699 So.2d 1285, 1293 (Ala. 1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998).
As the record shows, when the question complained of was asked, "What was [Hardy's] response when you told him if he had anything you could check out or investigate to indicate he was not guilty?," an objection to the question was sustained before Hale could respond. Thus, we do not know what his answer would have been. Up to that time, it appears from the record that Hardy had waived his Miranda rights, had agreed to talk to the officers, and appeared to be fully cooperating. There is nothing in the record to suggest that he ever contemplated electing to remain silent or deciding that he wanted to stop answering questions. Did Hardy invoke his right to silence when he was asked if there was anything the officers could check out or did he respond in some other way? We do not know; certainly the jury did not know. We agree with the statenothing was presented from which it could be inferred that Hardy had elected to remain silent or invoked his right to do so. The record is devoid of anything that indicates silence on Hardy's part.
We find the following particularly helpful in considering the circumstances surrounding Hardy's statement:
"In some circumstances it may be unclear whether a suspect has invoked his right to remain silent.... In some circumstances, however, a suspect's statement as to his willingness or unwillingness to answer questions, or his silence in response to some questions, does not constitute even an ambiguous or equivocal invocation of the right to remain silent. In Bradley v. Meachum, 918 F.2d 338 [ (2d Cir.1990), cert. denied, 501 U.S. 1221, 111 S.Ct. 2835, 115 L.Ed.2d 1004 (1991),], the suspect received Miranda warnings and indicated his willingness to talk to the police. When asked about the robbery at issue, Bradley first stated that he was not going to say whether he was involved or not; he then immediately denied any connection to the robbery. In the ensuing one-hour colloquy, Bradley talked about several subjects, including telling the officer that he had no alibi but then proceeding to account for his whereabouts at the time of the crime. The district court ruled that Bradley's initial statement constituted an invocation of his right to remain silent. We reversed, ruling that, in light of what followed, Bradley's initial statement that he would not say whether or not he had been involved was `part of an ongoing stream of speech,' and was `n[either] ... an invocation of the right to remain silent,' id. at 342, `no[r] the functional equivalent of silence,' id. at 343. See also United States v. D'Antoni, 856 F.2d 975, 980-81 (7th Cir.1988) (where in response to inquiry as to whether he was willing to answer questions, suspect stated that he had already given all the information he had, but he then answered further questions, that statement was not an assertion of the right to remain silent). In support of our holding in Bradley, we relied on, inter alia, United States v. Lorenzo, 570 F.2d 294, 297-98 (9th Cir. *268 1978), which held that though a suspect may, if he chooses, selectively waive his Fifth Amendment right by indicating that he will respond to some questions but not to others, his simple failure to respond to one question, after he has responded to others, does not constitute invocation of the right to remain silent."
United States v. Ramirez, 79 F.3d 298, 304-05 (2d Cir.), cert. denied, 519 U.S. 850, 117 S.Ct. 140, 136 L.Ed.2d 87 (1996).
In this case, Hardy's silence, if any, when Hale asked if he had any evidence to prove that he was not involved in the crime, while answering other questions, before and after, does not constitute even an equivocal invocation of his right to remain silent. We further conclude that, under the facts here, the jury would not have naturally and necessarily taken Hale's rendition of what occurred during the taking of Hardy's statement to be a comment on Hardy's silence. The trial court properly denied Hardy's motion for a mistrial.

V.
Hardy contends that the trial court erred in allowing Boyd and Hale, over objection, to testify that the gunman depicted in the store's surveillance videotape was Hardy. We first note, however, that Boyd did not so testify before the jury; he testified to that effect only in the suppression hearing. Thus, we review only the admission of Hale's identification of the gunman as Hardy. Hardy specifically argues that Hale's basis of knowledge for his identification was insufficient because, he says, Hale had not seen or known Hardy before the robbery-murder; he did not see Hardy on the day of the offense; and he had no extensive history with Hardy. We note that other witnesses also identified the gunman depicted in the videotape as Hardy: Officer Eric Partridge, Investigator Thomas Townsend, and Hines.
In Ex parte Rieber, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995), the Alabama Supreme Court addressed the question whether the identification by witness Wayne Gentle of Reiber as the gunman in the surveillance videotape showing the capital murder of a convenience store clerk was reversible error. The court disposed of this issue, as follows:
"[W]e note that we are aware of no rule (and Reiber does not cite us to one) preventing a lay witness from testifying to facts that are within his personal knowledge. See J. Colquitt, Alabama Law of Evidence, §§ 7.0, 7.1 (1990), and the cases cited therein; C. Gamble, McElroy's Alabama Evidence, § 127.01 (4th ed.1991), and the cases cited therein. Gentle testified that he had been a high school classmate of Reiber; that he knew Reiber when he saw him; and that he had seen and spoken to Reiber at the store at approximately 5:00 p.m. on the day of the murder. The record indicates that Gentle's identification of Reiber as the gunman shown on the videotape was based on his personal knowledge of Reiber's physical characteristics and on his appearance on the day of the murder.
"We also note Reiber's contention[] that Gentle's identification testimony... constituted a nonexpert opinion that usurped the function of the jury in evaluating the videotape.... [E]ven if we were to agree with Reiber's characterization of Gentle's testimony as an opinion, and we do not, our conclusion as to the admissibility of Gentle's testimony would not be different. Gentle personally observed Reiber on the day of the murder. At that time, according to Gentle, Reiber was wearing a light colored *269 T-shirt and a ball cap, and he had darker hair than he had at the trial. The record indicates that Reiber had cut his hair before the trial commenced; he wore a gray suit in court. It is well settled that if a lay witness is better qualified or in a better position than the jury to draw inferences from the facts, then it is permissible for that witness to express an opinion or to draw a conclusion from those facts personally observed by or known to the witness. Colquitt, Alabama Law of Evidence, supra; McElroy's, supra; Wright v. Rowland, 406 So.2d 830 (Ala.1981)."
663 So.2d at 1011-12.
In addressing the admissibility of Hale's identification testimony, we have also considered the pertinent discussion by the United States Court of Appeals for the Eleventh Circuit in United States v. Pierce, 136 F.3d 770 (11th Cir.), cert. denied, 525 U.S. 974, 119 S.Ct. 430, 142 L.Ed.2d 350 (1998). In that case, the court addressed the propriety, under Fed. R.Evid. 701,[4] of the admission of lay opinion testimony from Hardy's probation officer and his employer, identifying him as the individual depicted in a still photograph taken from a surveillance videotape of a bank robbery. We recognize that Alabama's counterpart to Fed.R.Evid. 701Ala.R.Evid. 701, which is identical to the federal rulewas not in effect at the time of Hardy's trial and, on its face, is different from the preexisting Alabama practice.[5] However, we nevertheless find the analysis in United States v. Pierce pertinent, for it also uses the inquiry used in Ex parte Rieber. (Ex parte Rieber casts the pertinent determination as whether the lay witness is better qualified or in a better position than the jury to draw the conclusion of identity from those facts personally observed by or known to him. In its discussion in United States v. Pierce, the court replaces the pertinent inquiry of whether there is some basis for concluding that the witness is more likely to correctly identify the defendant from *270 the surveillance photograph than is the jury with the focus of whether a witness is better able than the jury to make a correct determination.) The court in United States v. Pierce stated:
"Although this court has not previously addressed whether lay opinion testimony identifying a defendant in surveillance photographs is admissible under Rule 701, several other circuits have held such testimony admissible in some circumstances. Because we find, as have most of those circuits, that lay opinion identification testimony may be helpful to the jury where, as here, `there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury,' we hold that the district court acted within its discretion in admitting identification testimony from Hammond and Hammonds. United States v. Farnsworth, 729 F.2d 1158, 1160 (8th Cir.1984); see also United States v. Jackman, 48 F.3d 1, 4-5 (1st Cir.1995) (holding lay opinion identification testimony admissible `at least when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess, and when the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification'); United States v. Robinson, 804 F.2d 280, 282 (4th Cir.1986) (`A lay witness may give an opinion concerning the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.'); United States v. Towns, 913 F.2d 434, 445 (7th Cir.1990) (same); United States v. LaPierre, 998 F.2d 1460, 1465 (9th Cir.1993) (holding lay opinion identification testimony admissible where `there is reason to believe that the witness is more likely to identify correctly the person than is the jury'); United States v. Borrelli, 621 F.2d 1092, 1095 (10th Cir. 1980) (upholding the admission of lay opinion testimony regarding defendant's resemblance to the subject of a bank surveillance photograph where the witness `was in a much better position than the jury to give an opinion as to the resemblance between [defendant] at the approximate date of the robbery and the man in the surveillance photograph').
"We agree with our sister courts that whether a particular witness is better suited than the jury correctly to identify a defendant as the individual depicted in surveillance photographs turns on a number of factors. Perhaps most critical to this determination is the witness's level of familiarity with the defendant's appearance. As the Fourth Circuit observed in United States v. Allen, 787 F.2d 933, 936 (4th Cir.1986), vacated on other grounds, 479 U.S. 1077, 107 S.Ct. 1271, 94 L.Ed.2d 132 (1987):
"`[T]estimony by those who knew defendants over a period of time and in a variety of circumstances offers to the jury a perspective it could not acquire in its limited exposure to defendants. Human features develop in the mind's eye over time. These witnesses had interacted with defendants in a way the jury could not, and in natural settings that gave them a greater appreciation of defendants' normal appearance. Thus, their testimony provided the jury with the opinion of those whose exposure was not limited to three days in a sterile courtroom setting.'
"Accordingly, while familiarity derived from a witness's close relationship to, or substantial and sustained contact with, the defendant weighs heavily in favor of *271 admitting the witness's identification testimony, knowledge of the defendant's appearance based entirely on the witness's `review of photographs of [the defendant] and witnesses' descriptions of him' does not, as it is not based on anything more than the evidence the jury would have before it at trial. See LaPierre, 998 F.2d at 1465.
"Similarly, factors such as the witness's familiarity with the defendant's appearance at the time the surveillance photographs were taken or dressed in a manner similar to the individual depicted in the photographs, and whether the defendant had either disguised his appearance at the time of the offense or altered his appearance prior to trial, would also have some bearing on whether the witness is better able than the jury to make a correct identification. See United States v. Ellis, 121 F.3d 908, 926 (4th Cir.1997), cert. denied, 522 U.S. 1068, 118 S.Ct. 738, 139 L.Ed.2d 674 (1998) (upholding the admission of lay opinion identification testimony by a witness who had known defendant for approximately five years, where defendant had disguised himself with a mask and a hooded sweatshirt at the time of the offense); Towns, 913 F.2d at 445 (upholding identification testimony from defendant's former girlfriend, who had observed defendant's appearance on the day of the bank robbery, where the surveillance photograph depicted the robber `wearing a stocking cap, sunglasses, and a sweatsuit that potentially made him appear heavier than he really was' and where defendant had shaved his moustache off prior to trial); Borrelli, 621 F.2d at 1095 (finding lay opinion identification testimony helpful where witness, defendant's stepfather, `had independent knowledge of [defendant's] appearance both before and at the time of the robbery' and defendant `had significantly altered his appearance by changing his hairstyle and growing a moustache')."
136 F.3d at 774-75. See also People v. Morgan, 214 A.D.2d 809, 625 N.Y.S.2d 673, 674 (1995) ("It is now accepted that a lay witness may give an opinion concerning the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury."), appeal denied, 86 N.Y.2d 783, 655 N.E.2d 726, 631 N.Y.S.2d 629 (1995).
In considering the above principles, we note that Hale's identification rests upon the weakest foundation of the identifications introduced (the others being the identifications by Partridge, Townsend, and Hines).[6] Hale, the chief investigator for this case, testified that he spent a total of about 15 hours around Hardy after Hardy's apprehension, which included interviewing Hardy in Louisville and transporting him to Alabama. Partridge testified that he has known Hardy for 15 years; that they had gone to school together; that they rode the same school bus daily for five or six years; that he has also "known him through the police department" (R. 3134), and that, while he was a police officer, he saw Hardy two to three times a week; and that the last time he had seen him before the commission of the *272 September 7, 1993, robbery-murder was around August 20, 1993. Townsend testified that he has known Hardy all of Hardy's life; that he knows Hardy's family; that they live in the same community; and that, during the year preceding the capital offense, he saw Hardy an average of three times a week. Hines testified that, when he viewed the videotape several days after the offense, he identified the gunman in the videotape as Hardy. He further testified that he had been with Hardy on several occasions during the days preceding the crime and that he was with Hardy during the hours around the crime except between approximately 10:30 p.m., when he gave Hardy the keys to his automobile, and around 3:00 or 4:00 a.m. the following morning, when Hardy returned; and that after Hardy returned, they were going to go get breakfast, but instead Hardy took him to where the cash register was.
The above qualifications of each of these latter three witnesses constitute a clearly sufficient basis for concluding that each was better qualified or in a better position than the jury to correctly identify Hardy. Weighing heavily in favor of admitting their identifications is their "familiarity derived from a ... close relationship to, or substantial and sustained contact with" Hardy. United States v. Pierce, 136 F.3d at 774. For example, they had far more opportunity than the jurors to see Hardy from a variety of angles and distances and under different lighting conditions. In addition, they were more familiar with Hardy's carriage and posture. Because the depiction of the gunman was in fact a moving picture, the three, having seen Hardy in motion and being familiar with his mannerisms and body movements, were certainly in a better position to identify him than the jury, who had primarily seen Hardy motionless in a sterile courtroom. See State v. Hardy, 76 Wash.App. 188, 884 P.2d 8, 10 (1994). Moreover, all three witnesses were familiar with Hardy's appearance at the time the surveillance videotape was madeHines more than the two law enforcement officers because he had seen Hardy hours before and hours after the capital offense. We have also taken into consideration the fact that Hardy obscured his face from view at the time of the offense, thus altering his appearance in an attempt to avoid being identified. See United States v. Stormer, 938 F.2d 759, 762 (7th Cir.1991) ("Because the police officers who identified Stormer had worked with him for several years and were familiar with his appearance, they were in a better position to properly identify Stormer as the robber [depicted in the surveillance photographs] than the jury, especially in light of the fact that poor picture quality of the surveillance photographs in conjunction with Stormer's efforts to alter his appearance served to hinder the jury in making the crucial decision of whether Stormer was the man depicted in the surveillance photographs."). See also People v. Robinson, 908 P.2d 1152, 1155 (Colo.App.1995) (in rejecting the contention that the jury would not be less able to make a comparison than would the police detective, the court noted that the surveillance videotape is "less than clear"; that it shows, "for the most part, only a profile view of the robber"; that it distorts "to some extent the viewer's perspective concerning the robber's height"; and that it is "quite brief, and the opportunity to make a comparison is therefore limited"), aff'd, 927 P.2d 381 (Colo.1996). Particularly in regard to Hines's identification of Hardy as the gunman in the videotape, see Ex parte Rieber, 663 So.2d at 1011 (after observing that "[t]he record indicates that [the witness's] identification of Reiber as the gunman shown on the videotape was based on his personal knowledge of Reiber's physical characteristics *273 and on his appearance on the day of the murder," the Court stated that "even if we were to agree with Reiber's characterization of [the witness's] testimony as an opinion, and we do not, our conclusion as to the admissibility of [the witness's] testimony would not be different"); State v. Winston, 959 S.W.2d 874, 878 (Mo.Ct.App. 1997) (where the defendant's girlfriend's sister "had spent time with defendant in the time immediately surrounding the burglaries and was familiar with his features," and where "the person in the printout of the video tape was moving quickly and is somewhat difficult to see," there was a basis for concluding that the sister was more likely to correctly identify the defendant than was the jury in a print generated from a videotape of the surveillance camera, i.e., she was in possession of knowledge that the jury did not have and thus was helpful to the jury). We conclude that the trial court's admission of the identifications of Hardy by Partridge, Townsend, and Hines was within its sound discretion. See United States v. Pierce, 136 F.3d at 773 ("`The ultimate decision as to the admissibility of lay opinion testimony is committed to the sound discretion of the district court and will not be overturned on appeal unless there is a clear abuse of discretion.' United States v. Myers, 972 F.2d 1566, 1576-77 (11th Cir. 1992).").
Because three of the witnesses (Partridge, Townsend, and Hines) provided ample basis upon which to conclude that they were better qualified than the jury to correctly identify Hardy, we need not be concerned with any arguable weakness in Hale's identification testimony. Hale's identification was cumulative of the three other witnesses' identifications, which were clearly admissible. See also Robinson v. People, 927 P.2d 381, 384 (Colo.1996) ("although the witness must be in a better position than the jurors to determine whether the image captured by the camera is indeed that of the defendant, this requires neither the witness to be `intimately familiar' with the defendant nor the defendant to have changed his appearance"). Compare United States v. Pierce, (a probation officer, who had met with Pierce on 10 occasions during the 7-month period prior to the charged offenses, some of those meetings taking place in her office and others in Pierce's home, was properly allowed to give her opinion that the robber disguised with dark glasses and a baseball hat was in fact Pierce); State v. Gardner, 955 S.W.2d 819, 825 (Mo.Ct.App.1997) (officer's identification testimony provided assistance to the jury because the videotape was of poor quality, the perpetrator obscured part of his face with his arm, the officer had known Gardner for 10 years, and his identification was not the sole identification testimony, but supplemented the victim's identification and the images on the videotape, which the jury viewed); People v. Morgan, 214 A.D.2d at 809, 625 N.Y.S.2d at 674 (1995) (where the appellant changed his appearance before trial, detective who "encountered [him] less than five hours after the commission of the crime and remained with him for four or five hours during which time he had the opportunity to observe his facial features, physical characteristics, mannerisms and clothing," was properly allowed to give his opinion that the appellant was the robber depicted in the surveillance videotape).
In finding that the admission of the identification testimony presents no reversible error, we have rejected Hardy's specific contention that the identifications of Hardy constituted incompetent opinion evidence from lay witnesses because, he argues, the witnesses were not actually at the store at the time of the robbery-murder and thus they did not actually observe the facts as to which they testified. Contrary *274 to Hardy's assertion, it was not outside the knowledge of these witnesses to address in their testimony the question whether Hardy, whom they had sufficient basis to recognize, was the gunman in the videotape. Because they knew Hardy at the time of the crime, their conclusions that the person depicted in the videotape was Hardy were based on their perceptions. See Ex parte Rieber (even though the witness did not witness the crime, his identification was properly admitted because it was based, in part, on the witness's personal knowledge of Reiber's physical characteristics). We also reject Hardy's contention that, by testifying that they recognized Hardy as the gunman in the videotape, all identification witnesses gave impermissible opinions as to the ultimate fact in issue. "Although identification testimony embraces an issue of fact the identity of the perpetrator, and perhaps evidence of guiltthe persons providing the identifications are not providing opinions of defendant's guilt or innocence or telling the jury how it should decide the case." State v. King, 180 Ariz. 268, 883 P.2d 1024, 1036 (1994), cert. denied, 516 U.S. 880, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995).
Out of an abundance of caution, we note in conclusion the following:
"In upholding the admissibility of lay opinion identification testimony under Rule 701, courts have nevertheless recognized the danger of unfair prejudice that arises when the source of such testimony is a police, probation, or parole officer. See United States v. Calhoun, 544 F.2d 291, 296 (6th Cir.1976); United States v. Henderson, 68 F.3d 323, 327 (9th Cir.1995); United States v. Butcher, 557 F.2d 666, 669 (9th Cir.1977). Identification testimony from law enforcement or corrections personnel may increase the possibility of prejudice to the defendant either by highlighting the defendant's prior contact with the criminal justice system, if the witness's occupation is revealed to the jury, or by effectively constraining defense counsel's ability to undermine the basis for the witness's identification on cross-examination, if the witness's occupation is to remain concealed. See Calhoun, 544 F.2d at 295-96; Farnsworth, 729 F.2d at 1161; Henderson, 68 F.3d at 327. Indeed, concern regarding both types of prejudice has led at least two appellate courts to discourage the use of lay opinion identification by policemen and parole officers, unless such persons are the only source of adequate identification testimony. See Farnsworth, 729 F.2d at 1161; Butcher, 557 F.2d at 670.
"We share this concern, and, likewise, caution trial courts to admit this kind of identification testimony only in limited and necessary circumstances with all appropriate safeguards."
United States v. Pierce, 136 F.3d at 775-76. See also State v. Price, 701 So.2d 1204 (Fla.App. 3rd Dist.Ct.1997) (the prosecution should not have disclosed the occupation of the sheriffs deputy called to provide purely identification opinion testimony as to the identity of a person depicted in a videotape recording of the crime because his testimony impermissibly suggested that the defendant had had prior criminal contacts with law enforcement); 23 C.J.S. Criminal Law § 1055 (1989) ("the exclusion of lay identification testimony from law enforcement officials is warranted if the prejudicial effect of such testimony outweighs its probative value") (footnote omitted).
The testimonies of Hales, Partridge, and Townsend did not highlight Hardy's prior contact with the criminal justice system, i.e., they were not prejudicial in regard to disclosure of Hardy's past criminal activity. *275 Although Partridge did state that, in addition to having gone to school with Hardy, he had also "known him through the police department" (R. 3134), this statement does not highlight any prior contact Hardy may have had with Partridge because of prior criminal activity. (Partridge did not disclose to the jury that his last contact with Hardy before the capital offense was Hardy's release from jail.) See People v. Robinson, 908 P.2d at 1157 ("The fact that a person has `met' a detective `at some point' carries no direct connotation of culpability.").

VI.
Hardy contends that he was illegally arrested in Kentucky pursuant to an invalid fugitive warrant and that Alabama was without jurisdiction to return him to Alabama from Kentucky for trial. The thrust of his argument is that he was illegally arrested in Kentucky after the Kentucky authorities were informed by Boyd that Hardy was being sought pursuant to a fugitive warrant; that a fugitive warrant was necessary to authorize his return from Kentucky; and that the warrant in this case was not a fugitive warrant meeting the requirements of §§ 15-9-60, et. seq., because, he argues, the warrant was not issued pursuant to the Morgan County district attorney's requisition for return and was not endorsed by the Governor of Alabama.
Hardy was not, despite his claims to the contrary, arrested in Kentucky for the offense of being a fugitive from justice. The record shows that, shortly after the crime was committed and Hardy was identified as a participant in the crime, a warrant was issued for his arrest for the offense of capital murder. The Morgan County authorities, who had requested the assistance of the authorities in Louisville and Jefferson County, Kentucky, forwarded a copy of the warrant to the Kentucky authorities. Subsequently, relying on that warrant, the Kentucky authorities arrested Hardy. We find no error in this procedure.
Although, "[t]he general rule of law in this situation is that a warrant of arrest issued in one state can not be executed outside the boundary of the issuing state ... [the] rule is relaxed by the holding that where an officer of the non-issuing state has knowledge of the warrant, probable cause exists for the arrest in that state." State v. Everett, 110 Ariz. 429, 430, 520 P.2d 301, 302, cert. denied, 419 U.S. 880, 95 S.Ct. 144, 42 L.Ed.2d 120 (1974). See Street v. Cherba, 662 F.2d 1037, 1039 (4th Cir.1981). (In fact, this is reflected in Ala.Code 1975, § 15-9-41.)[7] Therefore, Hardy was properly arrested in Kentucky.
Furthermore, we hold that a fugitive from justice warrant was not required in this case. The record is replete with evidence, including Hardy's own testimony, *276 that he appeared before a judge in Kentucky, signed the necessary papers, waived extradition, and voluntarily returned to Alabama. As the attorney general points out, "[o]nce a fugitive has been brought within the custody of the demanding state, legality of extradition is no longer a proper subject of any legal attack by him." Davis v. State, 536 So.2d 110, 116 (Ala.Crim.App.1987), aff'd, 536 So.2d 118 (Ala.1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989).

VII.
Hardy contends that the prosecutor engaged in prosecutorial misconduct by making allegedly improper comments and that, as a result, he was denied a fundamentally fair trial, due process, and a reliable sentence. We review these contested comments for plain error only, Ala. R.App.P. 45A,[8] because defense counsel did not enter objection to any of the contested comments.
"`While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.' Ex parte Kennedy, 472 So.2d [1106,] 1111 [ (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985) ] (emphasis in original). `This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.' Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987)."
Kuenzel v. State, 577 So.2d 474, 489 (Ala. Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
"In considering what constitutes plain error in a capital case, we have adhered to the interpretation of the term `plain error' adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts. See Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 ... (1985); Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). See also Hooks v. State, 534 So.2d 329 (Ala.Cr.App. 1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). Plain error is error that has or probably has adversely affected a substantial right of the appellant, Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack."

Bush v. State, 695 So.2d 70, 87 (Ala.Crim. App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). "`[T]he plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)." Burton v. State, 651 So.2d 641, 645 (Ala. *277 Crim.App.1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).
In evaluating the propriety of prosecutorial arguments, we adhere to the following principles:
"As the United States Supreme Court stated in Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986):
"`It "is not enough that the prosecutors' remarks were undesirable or even universally condemned." The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).'"
Burton v. State, 651 So.2d at 651. (Citation omitted.)
"In United States v. Young, ... 470 U.S. [1], at 11, 12, 16, 105 S.Ct. 1038, 84 L.Ed.2d 1 [ (1985),] the Court noted:
"`Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, ... the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's [remark] would have on the jury's ability to judge the evidence fairly....
"`. . . .
"`Especially when addressing [a claim of] plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record. We have been reminded:
"`"In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution." Johnson v. United States, 318 U.S. 189, 202, 63 S.Ct. 549, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring).'"
Ex parte Parker, 610 So.2d 1181, 1183-84 (Ala.1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993). "Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Cr.App.1978), and that court is given broad discretion in determining what is permissible argument." Bankhead v. State, 585 So.2d 97, 105 (Ala.Crim.App. 1989), rev'd on other grounds, 625 So.2d 1146 (Ala.1993).
In its initial remarks to the jury, the trial court instructed the jury that an attorney's statements and arguments are not evidence and that the jury "should disregard any remark, statement, or argument which [is] not supported by the evidence or by the law," as instructed. (R. 2210.) The court repeated this instruction in its oral charge at the close of the guilt phase of the trial. (R. 3688.) After closing arguments in the penalty phase, the trial court instructed the jury as follows:
"Any comments or remarks or statements made by counsel are not evidence and cannot be used as evidence in this case. Likewise, any remarks that one attorney has used concerning the comments or remarks of another attorney, *278 that is not evidence, nor can those remarks be taken or used or looked at against ... either of the defendants."
(R. 3886-87.) During instructions, the court also stated, "Your deliberations and verdict should be based solely upon the evidence you have seen and heard and the law on which I have instructed you." (R. 3905, 3929.)

A.
Hardy contends that the prosecutor misstated the law when he told the jury in his opening argument in the penalty phase that the mitigating circumstance of § 13A-5-51(1)"no significant history of prior criminal activity"was not a mitigating circumstance, despite having conceded that the mitigating circumstance existed as to each defendant. He argues that, pursuant to the statement highlighted in the prosecutor's argument below, the jury did not consider this mitigating circumstance.
"There's at least one mitigating circumstance in this case that we admit is present. That is that neither defendant had a significant criminal history prior to this time. We will tell you that they don't. That's a mitigating circumstance and I think the judge will tell you that you can consider that. It's going to be our position that's not a mitigating circumstance.

"The Judge is going to tell you ... that you don't look to count up, there's one, two, three aggravating, or one, two, three, four mitigating; well, there's three here and four there. It's not just a matter of counting them but you're also supposed to weigh them.
"We submit to you in this caseI won't admit at all that [there] will be more mitigating circumstances than aggravating circumstances. But if they are, I submit to you they will not outweigh the weight of the aggravating circumstances in the way the crime was committed, and I'll ask you to return a verdict of death."
(R. 3751-52.)
It is clear from a reading of the prosecutor's arguments that, while the highlighted comment was a misstatement, it was inadvertent and was not intended to mislead the jury. It is further clear from a reading of all counsels' arguments and the trial court's instructions that the mistake was corrected and the jury was correctly informed that the state conceded the mitigating circumstance. "The allegedly inappropriate comment cannot be viewed in isolation, but rather should be in the context in which it occurred." Mason v. State, 768 So.2d 981, 991 (Ala.Crim.App. 1998).
In opening remarks in the penalty phase, Hardy's counsel stated, "The State... ha[s] also correctly indicated there's one mitigating circumstance that [it's] going to concede." (R. 3754.) In Hardy's counsel's closing remarks, he stated:
"Nobody has brought anything before you to tell you that he has done things like this before or done violent things before.
"In fact, the District Attorney has told you himself, and the Judge will instruct you that one of the mitigating circumstances that the law requires you to consider is the fact that my client had no prior criminal record of any significance."
(R. 3840-41.) Sneed's attorneys further remarked in closing, "[Y]ou do have the District Attorney's admission that there's no significant previous criminal history." (R. 3854.) In the prosecutor's closing remarks, he stated:
"And as I told you this morning, we admit because it's the truth, that neither *279 one of them had any, either Hardy or Sneed, any significant criminal history prior to this crime. Does that knock the punishment down for a crime like this one from death in the electric chair? Does the fact that he has never been charged with another crime before or convicted of another crime lessen the punishment for what you saw on that tape?"
(R. 3868-69.) Furthermore, in its sentencing instructions, the trial court stated the following in regard to the jury's recommendation of a sentence for Hardy:
"Only if you find beyond a reasonable doubt that one or both of the aggravating circumstances exist, would you then proceed to your second determination which is to answer this question: what mitigating circumstances exist in this case? The law of this state provides a list of some of the mitigating circumstances which you may look for in answering this question. Included in this list are the following specific mitigating circumstances:
"One. The defendant has no significant history of prior criminal activity. The State of Alabama has admitted the defendant has no significant history of prior criminal activity and therefore you must find that this mitigating circumstance exists."
(R. 3897-98.) (The court instructed the same in regard to the jury's consideration of recommendation of Sneed's sentence. (R. 3921-22.)) By these repeated reminders that the prosecution had conceded the existence of the mitigating circumstance, any prejudicial effect of the single and isolated comment highlighted above was certainly rendered harmless. Finally, we note that the failure of the four attorneys representing the defendants to object indicates the innocuous nature of the remark. We find no plain error.

B.
Hardy further asserts that the prosecutor impermissibly expressed his personal opinion that Hardy was guilty in his following highlighted closing arguments in the penalty phase:
"I told you when we started this case... that I expected in this case the evidence to show that on September the 7, 1993, these two defendants took the life of Clarence Nugene Terry during a robbery of a Bud's Store on the Beltline. It was a violent crime. And at the end of the case, that I was going to ask you to take their lives.

"I feel like we've shown you what we told you we were going to show. I'm going to ask you to do that [sentence them to death], and that's what I told you [I] was going to ask you at the beginning of the trial."
(R. 3837-38.)
"I want you to remember that even though [Hardy] was the one pulling the trigger, you have found by your verdict that Sneed intended for it to happen when he went in that store and knew it was going to happen and agreed with it happening.
"I remind you again, that there's no way this crime could have been committed the way it was committed by just Hardy. Sneed had to be there helping or it wouldn't have happened like it happened. It could not have.
"We don't have to speculate about that. You've got the best evidence in the world. You saw the crime happen. I've never been able to tell the jury that in my life."

(R. 3866.)
These comments certainly do not rise to the level of plain error, for the simple reason that the highlighted comments *280 were made during the penalty phase after the jury had already declared Hardy guilty. Thus, even if the prosecutor's comments could be interpreted as the prosecutor's personal opinion that Hardy was guilty, such would have been without any prejudicial effect. (We further note that we construe the highlighted comment in the second excerpt to refer to the evidence, specifically the videotape of the crime, establishing Sneed's guilt.) See also Boyd v. State, 715 So.2d 825, 841 (Ala.Crim.App.1997) (prosecutor's comment during the guilt-phase closing argument"I think that the State has proved to you beyond a reasonable doubt"was not improper, but was a legitimate inference and reasonable impression from the evidence), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
Hardy's argument in regard to the prosecutor's telling the jury that he had signed the indictment is addressed in Part C, infra.

C.
Hardy also contends that the prosecutor twice improperly read the indictment to the jury and stated that he had signed it. The prosecutor first read the indictment and noted his accompanying signature in his opening argument to the jury. (R. 2223-24.) He prefaced this statement by advising the jury that the indictment is not evidence; it is merely "a road map that we go by in a case." (R. 2222.) Before reading the indictment and noting his signature again at the beginning of his closing argument in the guilt phase, the prosecutor again warned that the indictment is not evidence. (R. 3559-61.)
Hardy specifically argues that, by telling the jury that he had signed the indictment, the prosecutor implied that "he, himself, believed in the truth of the grand jury's decision, enough to sign his name to it," which, Hardy argues, was "an improper expression of the prosecutor's personal opinion about Mr. Hardy's guilt" (Appellant's brief, p. 39), and further, that such acknowledgement bolstered the jury's perception of the prosecutor. In Boyd v. State, 715 So.2d 825 at 841-42, the court rejected a similar argument by an appellant with the following discussion:
"[T]he district attorney's noting in reading the indictment to the jury, that it was signed by him, is not an injection of his personal belief or otherwise improper. Similarly, in Arthur v. State, 711 So.2d 1031 (Ala.Cr.App.1996), [aff'd, 711 So.2d 1097 (Ala.1997),] the appellant argued that the prosecutor improperly inserted his credibility in an attempt to bolster the possibility of conviction by stating that the indictment had been signed by him in his capacity as district attorney. This Court stated:
"`Despite the appellant's argument to the contrary, there was no implication by the prosecutor in this case that he believed the appellant to be guilty and, therefore, was prosecuting the case. The jury was amply instructed that an indictment is not an indication of guilt but rather a vehicle for bringing an individual to trial and the prosecutor's acknowledgment that he signed the indictment in his capacity as district attorney was a statement of fact rather than an opinion or insertion of credibility.'

"Arthur, 711 So.2d at 1054. In the present case, the district attorney was merely reading the indictment to the jury, and his signature was recited as a portion of the indictment and a statement of fact."
"`The indictment is the compass and North Star of any criminal prosecution. The State must navigate its case according *281 to the indictment or risk venturing into the waters of prejudicial and reversible error.' Hatton v. State, 359 So.2d 822, 831 (Ala.Cr.App.1977), cert. denied, 359 So.2d 832 (Ala.1978)." Kuenzel v. State, 577 So.2d at 490 (holding that the prosecutor's explanation of the indictment in closing argument of the guilt phase was not improper, the court observed that the prosecutor prefaced his remarks by stating that the indictment was not evidence and further noted that the prosecutor may read and explain the indictment in his opening statement).
In rejecting Hardy's argument, we note that, before the jury heard evidence, the trial court instructed that the jury should not consider the indictment as evidence; that "[i]t is merely the written charge made by the State"; and that the jury could draw no adverse inference against the defendants based on the filing of the indictment. (R. 2204-05.) In addition, in its oral charge, the court thoroughly instructed the jury on the presumption of innocence (R. 3686-87) and again instructed the jury that the indictment is not evidence (R. 3688).
We also reject Hardy's contention that reading the indictment twice indicated to the jury that another group of individuals presumably, the grand juryhad already reviewed the evidence and found that Hardy had committed the crime. Compare the comments and cases discussed in Thomas v. State, 766 So.2d 860 (Ala.Crim.App.1998). We likewise reject Hardy's groundless contention that, by informing the jury that the district attorney had signed the indictment, the state implied that the prosecutor had a special knowledge of the case that others lacked.
Based upon the foregoing, we also reject Hardy's contention that the trial court prejudiced him by reading the indictment to the jury venire and noting the prosecutor's signature on it. (R. 270-72.)

D.
Hardy further contends that the prosecutor improperly "shifted the burden of proof and created an unconstitutional presumption of death," (Appellant's brief, p. 41) when, after discussing the argued nonstatutory mitigating circumstances and comparing them to the argued aggravating circumstances, the prosecutor stated,
"The ... nonstatutory mitigating circumstances in this case, in Hardy's case, the fact that he's got a family that loves him.... I feel terribly sorry for his mama, for his sister and anybody else in his family. I've been around these cases a long time and I feel sorry for those people. I sincerely do. But that doesn't excuse what [Hardy] did. I'm not making light of their feelings. If we never imposed the death penalty on anyone... who had a mama that loved them or a sister that loved them, we wouldn't have y'all in Court. I submit to you that's not enough to overcome what you saw in that tape."

(R. 3869-70.)
We consider the above comment to be legitimate.
"`"Whatever is in evidence is considered subject to legitimate comment by counsel." Bankhead v. State, 585 So.2d 97 (Ala.Cr.App.1989), aff'd, 585 So.2d 112 (Ala.1991). See also Ward v. State, 440 So.2d 1227 (Ala.Cr.App.1983). "The prosecutor has the right to present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way." ... Donahoo v. State, 505 So.2d 1067, 1072 (Ala.Cr.App.1986).'"
Burton v. State, 651 So.2d at 651 (holding that the prosecutor did not commit plain *282 error by arguing that there was "not one shred of evidence" that the defendant and his accomplices did not commit robbery and intentionally kill during that robbery, the court rejected the contention that such argument impermissibly shifted the burden of proof to the defendant) (quoting Williams v. State, 601 So.2d 1062, 1072-73 (Ala.Crim.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992)).

E.
Hardy contends that the cumulative effect of the prosecutor's allegedly improper comments rendered his trial and sentencing unreliable and violated his rights to due process, a fair trial, and an impartial jury. We have reviewed each allegedly improper comment and have found no error warranting reversal. We have also reviewed the allegedly improper comments collectively, and still find no reversible error.

VIII.
Hardy claims that reversible error occurred because he was not present during part of an in camera hearing on the redaction of Sneed's statement and during the in camera questioning of a juror regarding that juror's request for two videotape recorders during deliberations. He contends that his absence violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution; Article 1, § 6, Alabama Constitution of 1901; Rule 9.1, Ala.R.Crim.P.; and Alabama caselaw.
We have reviewed the portions of the record relating to these two in-chambers hearings pursuant to the plain error rule because this issue is raised for the first time on appeal. In both instances, Hardy specifically waived his presence during these portions of the proceedings trial. In the first instance, the following occurred in regard to the discussion concerning Sneed's redacted statement:
"[SNEED'S COUNSEL]: ... Basically the same arguments were made before the chambers and after and we've adopted all of those arguments back and forth, but neither one of the defendants [was] present in your chambers. Certainly, Mr. Sneed wasn't. I don't intend to state for Mr. Hardy.
"[HARDY'S COUNSEL]: Mr. Hardy wasn't.
"[SNEED'S COUNSEL]: We've talked to our client. He's aware of that. He waives his presence for that one brief hearing. I know it didn't take long. Basically, for the record, it was just a continuation of the arguments we made before. They were strictly legal arguments and his presence wouldn't have added to that hearing.
"[HARDY'S COUNSEL]: Judge, I'll just ask my client. John, do you waive your presence in chambers?
"[HARDY]: Yes, sir."
(R. 2733-35.) In the second instance, immediately before the in-chambers questioning of a juror, the following occurred:
"[HARDY'S COUNSEL]: Defendant Hardy waives his right to be present during the questioning of juror [D.M.]. John, did you hear what I said?
"[HARDY]: Yes, sir.
"[HARDY'S COUNSEL]: Is that correct?
"[HARDY]: Yes, sir."
(R. 3660-61.)
We are not convinced by Hardy's argument that this court should rule that his presence at these portions of the proceedings trial could not be waived. The two hearings were related to legal matters and were not related to Hardy's guilt or innocence, *283 and his presence would not have benefited his defense. Burgess v. State, 723 So.2d 742 (Ala.Crim.App.1997). See also Harris v. State, 632 So.2d 503 (Ala. Crim.App.1992). He has not demonstrated that he suffered any prejudice as a result of his absence.

IX.
Hardy contends that his statutory and constitutional rights were violated by the state's failure to comply with the discovery order of the trial court. He argues that he is entitled to a reversal of his conviction because this failure affected his ability to adequately prepare a defense. He relies principally on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Ex parte Monk, 557 So.2d 832 (Ala.1989); and Padgett v. State, 668 So.2d 78 (Ala.Crim.App.), cert. denied, 668 So.2d 88 (Ala.1995). Hardy filed numerous pretrial motions to produce. The trial court granted broad discovery, as contemplated in Ex parte Monk, which in essence required the state to maintain an open file policy with the exception of any work product.

A.
Hardy specifically claims that the state violated the discovery order by failing to timely disclose its intent to call Steve Bernard and Tom Edwards as witnesses and by failing to produce their records and reports. He objected to their alleged testimony on these grounds when they were called to testify.
Bernard, an employee for the company that installed the surveillance system in Bud's Convenience Store, testified that he checked the surveillance system and cleaned the video camera lens within the month before the crime and that the surveillance was working properly. He kept no records and apparently made no written reports. The record reveals that Hardy was furnished Bernard's name as a potential witness for the state approximately one week before he testified.
Edwards, an expert witness in "forensic video image analysis," prepared enhanced video images from the security camera videotape, but these enhanced video images were not introduced into evidence. Edwards testified that he had examined the videotape and that he found it to be the original and that it had not been altered in any way. The record shows that, before trial, Hardy was aware of this witness and had examined the enhanced video images in the files of the Decatur Police Department. The record also shows that Hardy interviewed Edwards the day before he testified and discovered at that time that he had some records reflecting his examination of the videotape. The state had no knowledge of any records, only of the enhanced video images in the police files. Edwards testified that he had misplaced his files but that he had found them the night before he testified. When Hardy objected to Edwards's testimony on the ground that he had not seen the records and that the failure to produce them violated the discovery order, the trial court ordered a recess to permit Hardy to examine Edwards's records and ordered Edwards to produce them. After reviewing the records, Hardy complained that they had not previously seen the "cover letter" and "bill" that had apparently been sent by Edwards to the Decatur Police Department. The trial court extended the recess and allowed Hardy to review and copy those items.
As we have previously stated, we view any failure to comply with the discovery rule, Ala.R.Crim.P. 16, with disfavor; however, we also recognize that a failure to comply does not always mandate reversal. McLemore v. State, 562 So.2d 639 *284 (Ala.Crim.App.1989). Rule 16.5 provides as follows:
"If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; may grant a continuance if requested by the aggrieved party; may prohibit the party from introducing evidence not disclosed; or may enter such other order as the court deems just under the circumstances. The court may specify the time, place, and manner of making the discovery and inspection and may prescribe such terms and conditions as are just."
The trial court's discovery order required the state to disclose the names of all of its witnesses it expected to call, as well as to make available to the defense all documents, books, papers, tangible objects, and reports of examinations and tests that would be material to the preparation of the defendant's defense and that were in the possession of the state. After reviewing the record, we cannot conclude that the state violated the discovery order in this case.
However, even if we were to determine that a violation occurred, there still would be no ground for reversal. Rule 16.5 gives the trial court a range of sanctions that may be imposed in the event of noncompliance with the court's discovery order. The rules allow for the admission of probative evidence while ensuring that the opposing party has adequate time to review the evidence. Among these remedies are a recess and a continuance. Buchannon v. State, 554 So.2d 477 (Ala.Crim. App.), cert. denied, 554 So.2d 494 (1989); McLemore v. State. "Moreover, the trial court should not impose a sanction which is harsher than necessary to accomplish the goals of the discovery rules." McCrory v. State, 505 So.2d 1272, 1279 (Ala.Crim. App.1986): Pilley v. State, 789 So.2d 870, 881 (Ala.Crim.App.1998). In the case of Bernard, there were no files, reports, or records to be produced, and Hardy knew or should have known that Bernard was a potential state witness a week before he was called. In view of what Hardy and his counsel had already seen on the videotape, Bernard's testimony that the surveillance camera was in working order hardly came as a surprise. In the case of Edwards, the trial court obviously deemed the total exclusion of his testimony, as requested by Hardy, too severe a sanction to impose on the prosecution, if indeed, the court found a violation of its discovery order. It chose to remedy the situation by ordering a recess and extending that recess to permit Hardy to examine Edwards's records. Under the circumstances presented here, we think that the trial court's method of handling the situation was proper. The recess in this case was sufficient to protect Hardy's rights. We certainly cannot say that the trial court abused its discretion in this regard. To support a claim for reversal of the exercise of the trial court's discretion, a defendant must show prejudice to his substantial rights. McLemore v. State; McCrory v. State. Under the facts of this case, the trial court's permitting Bernard and Edwards to testify, over Hardy's objection, did not prejudice Hardy's substantial rights. He had sufficient time to interview the witnesses and to examine the records. He was afforded the opportunity to cross-examine the witnesses and he took full advantage of it.
Hardy cites Brady v. Maryland to support this contention; however, the rule in Brady does not apply here: the evidence was not exculpatory. The trial court's discovery order clearly complied with the spirit of Ex parte Monk. Padgett v. State is factually distinguishable from this case.

*285 B.
Hardy contends that the trial court erred in denying his pretrial motion for the production of the criminal records or "histories," if any, of law enforcement witnesses that the prosecutor intended to call. Hardy's pretrial motion sought the criminal records of all witnesses who were expected to testify for the prosecution. It sought all information of a criminal nature known to the prosecutor as well as what the prosecutor could obtain by "the exercise of reasonable efforts." He relies on Brady v. Maryland; United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); and Ex parte Monk. The trial court initially granted the motion, in part, stating in its order, "If the state is aware of the prior criminal record of a witness, except members of law enforcement or forensic witnesses, the state shall provide such information to counsel for the defendant." (C.R. 207.) Subsequently, at a hearing on the motion, the trial court expanded its order to include the production of the criminal records, including those, if any, of law enforcement officers the prosecutor intended to call as witnesses if the prosecutor had knowledge of any such records. The order stated:
"The motion is granted to the extent that it was previously granted in terms of criminal records of lay witnesses, you might say. If the state is aware that the law enforcement officer has a prior criminal record, then that would be disclosed. If you are aware of that. I'm not asking you to seek it out, but certainly you need to disclose that prior to that witness's testimony."
(C.R. 223.)
In Williams v. State, 710 So.2d 1276, 1296-97 (Ala.Crim.App.1996), we stated:
"In Brady, 373 U.S. at 87[, 83 S.Ct. 1194], the Supreme Court held that `the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' A Brady violation occurs where: (1) the prosecution suppresses evidence; (2) the evidence is favorable to the defendant; and (3) material to the issues at trial. Stano v. Dugger, 901 F.2d 898, 899 (11th Cir.1990); Delap v. Dugger, 890 F.2d 285 (11th Cir.1989); United States v. Blasco, 702 F.2d 1315, 1327 (11th Cir.), cert. denied, 464 U.S. 914, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983); Ex parte Kennedy, 472 So.2d 1106, 1110 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). The Supreme Court of the United States in United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (plurality opinion by Blackmun, J.), defined the standard of materiality required to show a Brady violation as follows: `The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' See also Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); Stano v. Dugger, 901 F.2d at 899; Delap v. Dugger, 890 F.2d at 299; Coral v. State, 628 So.2d 954 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Thompson v. State, 581 So.2d 1216 (Ala.Cr.App.1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).

*286 "The same standard of materiality and due process requirements apply whether the evidence is exculpatory or for impeachment purposes. United States v. Bagley; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Ex parte Womack, [435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983)]. `When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within the general rule.' Giglio, 405 U.S. at 154[, 92 S.Ct. 763] (quoting Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). In short, due process requires the prosecution to disclose material evidence, upon request by the defense, when that evidence would tend to exculpate the accused or to impeach the veracity of a critical state's witness."
As a general rule, the government need not disclose evidence available to the defense from other sources or evidence that the prosecution could not reasonably be imputed to have knowledge of or control over. Mills v. Singletary, 63 F.3d 999 (11th Cir.1995), cert. denied, 517 U.S. 1214, 116 S.Ct. 1837, 134 L.Ed.2d 940 (1996); United States v. Moore, 25 F.3d 563 (7th Cir.), cert. denied, 513 U.S. 939, 115 S.Ct. 341, 130 L.Ed.2d 297 (1994).
We have held in Alabama in a number of cases that a defendant is not entitled to the general disclosure of the criminal records of the state's witnesses. See, e.g., Davis v. State, 554 So.2d 1094 (Ala.Crim. App.1984), aff'd, 554 So.2d 1111 (Ala.1989), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991); Wright v. State, 424 So.2d 684 (Ala.Crim.App.1982) (no absolute right of disclosure of criminal records of state's witnesses); Mardis v. State, 423 So.2d 331 (Ala.Crim.App.1982); Mack v. State, 375 So.2d 476 (Ala.Crim.App. 1978), aff'd, 375 So.2d 504 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3044, 65 L.Ed.2d 1134 (Ala.1980). We have also held that the trial court's refusal to order the prosecution, pursuant to a defendant's discovery motion, to provide the criminal record of each expected witness for the state was not a violation of Brady and its progeny. Davis v. State, 554 So.2d at 1100.
The trial court, in this case, granted Hardy broad and extensive discovery. In the exercise of its discretion, it granted Hardy discovery far beyond that required by the discovery rule and in keeping with the purpose and spirit of the holding of the Alabama Supreme Court in Ex parte Monk. In effect, Hardy obtained practically everything he sought in the way of discovery. After ordering the disclosure of any criminal records of all lay witnesses, the court at first chose to deny the request for the criminal records, if any, of law enforcement witnesses, but then amended its order and ordered the prosecutor to disclose any criminal records that the prosecutor was aware of pertaining to any law enforcement witnesses. The only thing Hardy did not get was an order requiring the prosecutor to search for criminal records outside his office and jurisdiction and in areas he would not reasonably have knowledge of or control over. It also appears from the colloquy between counsel and the court that this information would be reasonably available to the defense from other sources. Under the circumstances here, and in the absence of any indication otherwise, we cannot say that the denial, a decision that was within the trial court's discretion, was improper. We find no Brady or other discovery violation here.

C.
Hardy further contends that his conviction should be reversed because *287 the grand jury proceedings in his case were not recorded. He argues that the failure to record the testimony of witnesses appearing before the grand jury in his case denied him the right to adequately cross-examine and to impeach the witnesses testifying against him, to identify constitutional errors related to the grand jury proceedings, and to have an adequate record for appeal. He does not assert that any particular witness's testimony at trial was inconsistent with that witness's testimony before the grand jury. Rather, he complains that because he was unable to review the grand jury testimony because it was not recorded, he was unable to identify possible contradictory prior statements that would have enabled him to impeach prosecution witnesses. No objection was raised in the trial court concerning the failure to record the grand jury proceedings. Thus, we review this issue under the plain error rule. In this case, the testimony of the witnesses before the grand jury that returned the indictment against Hardy was not recorded.
In Alabama there is no statute requiring that testimony before a grand jury be recorded. "A Grand Jury is not required to compile records and the testimony in the absence of a statute requiring preservation of the proceedings. State ex rel. Baxley v. Strawbridge, 52 Ala.App. 685, 296 So.2d 779 (1974). There is no such statute in this state." Sommerville v. State, 361 So.2d 386, 388 (Ala.Crim.App.), cert. denied, 361 So.2d 389 (Ala.1978), cert. denied, 439 U.S. 1118, 99 S.Ct. 1027, 59 L.Ed.2d 78 (1979). See also Gaines v. State, 52 Ala.App. 29, 30, 288 So.2d 810, 812, cert. denied, 292 Ala. 720, 288 So.2d 813 (1973), cert. denied, 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82 (1974). Because there was no legal requirement that the grand jury proceedings be recorded, this contention is without merit.
We note that the trial court granted Hardy's pretrial discovery motions ordering the prosecutor to furnish Hardy with any grand jury or other pretrial testimony or statements, oral or written, of any prosecution witness that was substantially inconsistent with their testimony at trial. Thus, Hardy's concerns relative to possible inconsistent testimony of prosecution witnesses before the grand jury were addressed by the trial court by its ordering the prosecutor to disclose to Hardy any inconsistencies. In the absence of some indication to the contrary, and we find none, we must presume that the state complied with the trial court's order.

X.
Hardy contends that the trial court's finding that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses was erroneous "for a number of reasons." See § 13A-5-49(8). The only grounds asserted, however, are that the prosecution did not "properly" prove this aggravating circumstance and that the facts of this crime, when compared to those cases in which we have held that the circumstance was supported by the evidence, do not separate this crime from other capital murders.
The trial court made the following pertinent findings:
"The court finds the State has proven beyond a reasonable doubt the offense was especially heinous, atrocious, and cruel. This crime is set apart from other capital cases in that the crime was a conscienceless and pitiless crime and was unnecessarily torturous to the victim. The defendant shot and killed Clarence Nugene Terry. When the first shot was fired, the victim ran behind the counter and attempted to hide, rolling himself into a ball; however, the defendant leaned over the counter and shot *288 the victim in the chest. After doing so, the defendant then stood over the victim and shot him in the head at least five more times while the victim lay unarmed and helpless on the floor. Further, the victim did not die immediately after the first shot, but lived for at least fifteen (15) seconds while the defendant continued to fire shots into his head. Therefore, the aggravating circumstance specified in Section 13A-5-49(8), Code of Alabama, does exist and is considered by the court in determining the appropriate sentence to impose in this case."
(C.R. 30-31.)
We find that the trial court's findings are fully supported by the record, and we concur in them.
"The evidence in this case clearly supports the trial court's finding that this capital offense was especially heinous, atrocious, and cruel. The appellant shot the victim in the wrist and then shot the victim in the head after she had fallen to the ground. `When a defendant deliberately shoots a victim in the head in a calculated fashion, after the victim has already been rendered helpless by [prior] gunshots ..., such "extremely wicked or shockingly evil" action may be characterized as especially heinous, atrocious, or cruel.' Lawhorn v. State, 581 So.2d 1159 (Ala.Crim.App.1990), aff'd, 581 So.2d 1179 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991). See also McWilliams v. State, 640 So.2d 982 (Ala.Crim.App.1991), aff'd in part, remanded in part on other grounds [640 So.2d 1015 (Ala.1993), aff'd after remand, 666 So.2d 89 (Ala.Crim. App.1994), aff'd, 666 So.2d 90 (Ala. 1995) ]. Bush v. State, 431 So.2d 555 (Ala.Crim.App.1982), aff'd, 431 So.2d 563 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). Further, `[e]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, and cruel. Ex parte Whisenhant, 555 So.2d 235, 243-44 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).' White v. State, 587 So.2d 1218 (Ala.Crim.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992)."
Rieber v. State, 663 So.2d 985, 993 (Ala. Crim.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995). See also Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989); Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997). Finally, we note that the prosecution's evidence met the burden set out in Ex parte Clark, 728 So.2d 1126 (Ala.1998): the victim was in fact conscious and aware during most of the ordeal.

XI.
Hardy contends that the trial court erred in failing to conduct individually sequestered voir dire of the jury venire to determine whether any veniremember's impartiality had been affected by pretrial publicity.
"In Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court. Browning v. State, 549 So.2d 548 (Ala. Cr.App.1989); Bui v. State, 551 So.2d 1094 (Ala.Cr.App.1988), aff'd, 551 So.2d 1125 (Ala.1989), vacated [on other ground], 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991)."
*289 Coral v. State, 628 So.2d 954 (Ala.Cr.App. 1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). Furthermore, "`the decision of the trial court in denying individual voir dire examination will not be disturbed absent abuse of that discretion.'" Henderson v. State, 583 So.2d 276, 283 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992) (quoting Hallford v. State, 548 So.2d 526, 538 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989)).
Before trial, Hardy filed a motion to be allowed to individually voir dire the veniremembers. In conditionally denying the motion, the trial court stated, "Should a venire member give an answer indicating the necessity for sequestration, that individual veniremember shall be questioned individually on that subject." (C.R.201.) The trial court separated the venire into panels, and each panel was thoroughly questioned by the court and by Hardy's and Sneed's defense counsel regarding the members' exposure to pretrial publicity and whether they could set aside anything that they had heard and decide the case fairly and impartially. Thereafter, counsel was allowed to individually question any member whose answer caused concern. In fact, the trial court granted counsel wide latitude in the questioning of the venire as a whole and in individually questioning particular members.
We conclude that the trial court did not abuse its discretion in its handling of the voir dire examination, and thus find no error.

XII.
In a one-page argument, Hardy contends that the trial court's failure to order a change of venue for his trial "violated state law and denied [him] his right to a fair sentencing hearing by an impartial jury." (Appellant's brief, p. 55.) In support, he offers only the following discussion:
"Both the written and the broadcast media extensively covered the tragic murder, the investigation, and Mr. Hardy's arrest. (C. 45, 179-181.) Mr. Hardy's co-defendant, Mr. Sneed, had given an inculpatory statement to television reporters while he was being booked at the Morgan County Jail. (R. 2375.) Moreover, many jurors in the jury pool had heard about the case. (R. 303, 549, 658-662, 1137, 1256-58.) In one venire panel, the entire panel had heard or read about the crime. (R. 1548.)"
(Brief, pp. 54-55.)
We in no way condone a party's reliance on the mere citing of page numbers from the record, without a discussion of the pertinent facts from those pages and application of the pertinent law to those facts. We consider such reliance an indication of a lack of merit of the contention the party asserts. Nonetheless, out of an abundance of caution, we will review Hardy's claim.
We first note that the first series of page citationsC. 45, 179-81is Hardy's unsworn motion for a change of venue and his unsworn request for an evidentiary hearing on the motion for a change of venue.
We further note that on R. 2375, the chief detective for the Decatur Police Department testified that Sneed spoke to some reporters, including a television reporter. This testimony was after the trial court's denial of Hardy's motion for a change of venue and would also have been insufficient as evidence of pretrial publicity.
We assume that, by citing to R. 303, Hardy is referring to the individual voir *290 dire answers of veniremember B.L.T. that she did not know if she could consider the case fairly and impartially and that she had heard that "they did have a video and different things of what had happened," such as the fact that the victim begged his assailants not to shoot him. She also explained, on R. 302, that her sister, an employee of a Bud's Convenience Store, talked a lot about the crime when it happened and that she worries for her sister's safety. The defenses' challenges for cause of this veniremember were granted. (R. 331.)
We assume that, by citing to R. 549, Hardy is referring to D.R.P.'s affirmative answer, in the voir dire of panel 1, to the question whether any one remembered thinking, when he or she heard of the crime, that this was a very horrible crime. He subsequently stated that he "just remembered the fact that it was supposedly on film and that [the victim] was shot several times." (R. 551.) During individual voir dire, D.R.P. also remembered that one suspect was caught in Louisville and the other was from Tanner (R. 604); he stated that, during the week following the crime, the newspaper published daily articles about it (R. 604); he answered that his recollection would not affect his ability to determine the facts in evidence and apply the law as instructed by the court (R. 607-08); and he assured the court that he could set aside any preconceived notions or information and render a fair and impartial verdict on the evidence introduced at trial (R. 608).
We assume that, by citing to R. 658-62, Hardy is referring to R.L.B.'s response that he had heard about the case on "the news" (R. 658); and to the responses of L.S.B., E.H.H., E.J.W., W.E.E., and B.L.S. that they had read about the case in the newspaper. Only two answered that they remembered details: R.L.B., who remembered only "bits and pieces," which he did not specify (R. 661), and L.S.B., who remembered "names" and location (R. 662). No member of panel 2 responded to the question whether any one feels that he or she could not disregard what he or she had read or heard in favor of the evidence at trial. The defenses' challenges for cause of L.S.B., based on her responses regarding the death penalty, were granted (R. 860). R.L.B. was questioned individually because he was the only other member of panel 2 to specifically remember the crime. During this voir dire, R.L.B. stated that he read the newspaper coverage on the previous Sunday and that he had not formed an opinion on the question of guilt; he answered that he had not read or heard anything that would have disclosed any facts that indicated either defendant's guilt; and he gave the assurance that he believed he could consider only the evidence introduced at trial.
We assume that, by citing to R. 1137, Hardy is referring to the individual voir dire of B.J.S. On the page cited, B.J.S. stated that he had read a newspaper article published soon after the crime occurred. B.J.S. also stated during individual voir dire that he remembered that Sneed was from Kentucky, that Sneed had been picked up there and brought back, and that Hardy was from Tanner (R. 1137-38); that he could not remember any details of the crime (R. 1138); that he had not formed any opinion about the case (R. 1139); that what he had read would have no bearing on his determination of guilt or innocence (R. 1139); and that he pledged not to consider any knowledge gained from the media (R. 1140).
We assume that, by citing to R. 1256-58, Hardy is referring to the responses of C.E.S., S.D.M., L.L.B., L.D.H., S.R.W., and T.Y.B. that they had read about the crime in the newspaper and also the responses *291 of J.L.K. and E.C.W. that they had heard about it. During the questioning of panel 4, no one responded when asked if anyone who had heard or read something about the crime could not go by the evidence, but would be affected by what he or she had heard or read. (R. 1259-60). The panel was also asked if any one remembered any facts about this case. All indicated that they did not. No veniremember responded to the inquiry whether any facts known to any veniremember indicate that either defendant was guilty. All indicated that he or she had not formed an opinion as to guilt or innocence on what he or she had heard or seen outside the courtroom. (R. 1425-26.) L.L.B. was excused because she and her husband were potential witnesses. (R. 1427-28.) E.C.W. was excused pursuant to a challenge for cause, based on her sentiments against the death penalty. (R. 1450.) T.Y.B. was also excused on a challenge for cause. (C.R.111.)
By citing to R. 1548, Hardy is referring simply to a question directed to panel 5: has anyone heard about this case? All panel members answered affirmatively. (R. 1549.) When asked if anyone remembered details, only S.D.P. answered. (R. 1550.) On individual voir dire, S.D.P. acknowledged that he had frequented the store at which the clerk had been killed and that he knew its layout; that he had seen the victim working there; that he knew that the crime was an execution-style robbery-murder and that it was on videotape; and that he knew how the defendants had been apprehended. (R. 1688-1706.) He further stated that this knowledge would not impair his ability to hear the facts and to make a decision on only the evidence and that he would try the case fairly and impartially and apply the law as required.
Hardy's pretrial motion for a change of venue and his request for an evidentiary hearing were conditionally denied with leave to renew them during voir dire of the jury venire. (R. 67.) Hardy renewed his motion for a change of venue after the parties exercised their strikes, basing it on "all of the evidence that came forth in the voir dire examination." (R.2076-77.) The trial court denied the motion, with the following findings:
"I am going to deny that based on the responses during the voir dire of the persons on the panel. Most people had no detailed knowledge of what had occurred. There was one juror that said he had already formed an opinion and theand it couldn't be removed, and the Court challenged him."
(R. 2077.)
In addressing the trial court's denial, we foremost note that Hardy's motion was not "made on oath," as required by Rule 10.1(c), and thus is procedurally defective. See Ivery v. State, 686 So.2d 495, 513 (Ala.Crim.App.1996), aff'd as to sentence after remand, 686 So.2d 520 (Ala.Crim. App.1996) (death penalty case); Callahan v. State, 557 So.2d 1292, 1306 (Ala.Crim. App.), aff'd, 557 So.2d 1311 (Ala.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 216, 112 L.Ed.2d 176 (1990) (review of denial of a motion for a change of venue in a death penalty case, under requirement of § 15-2-20(a), that the application be sworn to).
Moreover, Hardy's unsworn allegations are rendered impotent by application of the following principles:
"`It is well established in Alabama ... that the existence of pretrial publicity, even if extensive, does not in and of itself constitute a ground for changing venue and thereby divesting the trial court of jurisdiction of an offense.' Ex parte Fowler, 574 So.2d 745, 747 (Ala. 1990).

*292 "`The defendant has failed to satisfy the test set out in Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), because he has not proved that "there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity." "Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue." Id. "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved." Id. "The relevant question is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).
"`"To ensure that the defendant has a fair and impartial jury, it is not necessary that the venire-members be totally ignorant of the facts surrounding the case. Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). `It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)."

"`Ex parte Whisenhant, 555 So.2d 235, 238 (Ala.1989).'

"Kuenzel v. State, 577 So.2d 474, 483-84 (Ala.Cr.App.1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
". . . .
"`A criminal defendant is not constitutionally entitled to trial by jurors ignorant about relevant issues and events.... "The relevant question is not whether the community remembered the case, but whether the jurors... had such fixed opinions that they could not judge impartially the guilt of the defendant." ... In determining the existence of presumptive prejudice, a court must consider the totality of the circumstances, including the type of pretrial publicity, the time lapse between peak publicity and the trial, and the credibility of prospective jurors who indicate during voir dire that they could be impartial despite having been exposed to pretrial publicity about the case.... We note that "the presumptive prejudice standard... is only `rarely' applicable ... and is reserved for an `extreme situation.'"... "In short, the burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one."'

"United States v. Lehder-Rivas, 955 F.2d 1510, 1524 (11th Cir.), cert. denied, 506 U.S. 924, 113 S.Ct. 347, 121 L.Ed.2d 262 (1992).
"Our review convinces this Court that the trial judge did not abuse his discretion in denying the motion for a change of venue.
"`"The trial court's findings of impartiality should be overturned only for `manifest error.' Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)." Fortenberry v. State, [545 So.2d 129 (Ala.Cr.App.1988), affirmed, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990) ]. "Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex *293 parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983)." Ex parte Grayson, 479 So.2d [76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985) ]. We find no abuse of discretion by the trial court or manifest error in his finding of impartiality.'

"Oryang v. State, 642 So.2d 979 (Ala.Cr. App.1993) (every member of venire indicated that they had been exposed to pretrial publicity). See also Thomas v. State, 539 So.2d 375, 394 (Ala.Cr.App.) (`[a]t the beginning of voir dire, every member of the venire stated he or she had read or heard about this case'), affirmed, 539 So.2d 399 (Ala.1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989). Here, as in Thomas, 539 So.2d at 395, the appellant has `failed to show a connection between the pre-trial publicity and the existence of actual jury prejudice.'"
Smith v. State, 646 So.2d 704, 706-07 (Ala. Crim.App.) (where every veniremember acknowledged having heard of the capital offense), cert. denied, 646 So.2d 704 (Ala. 1994). See also Holladay v. State, 549 So.2d 122, 126 (Ala.Crim.App.1988) ("The fact that virtually every prospective juror had some knowledge of the appellant's case does not mean the appellant could not receive a fair and impartial trial."), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
In applying the above principles, we first note that Hardy did not introduce any evidence whatsoever of any pretrial media coverage, much less substantial, prejudicial publicity. Thus, he has not shown that the media coverage saturated the community with prejudicial publicity. See Spurgeon v. State, 560 So.2d 1116, 1122 (Ala.Crim. App.1989), relying on Ex parte Kennedy, 472 So.2d 1106, 1113 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
Moreover, although Hardy contends that a review of the cited pages from the record shows that he was actually prejudiced by any pretrial publicity, we can find no evidence in the record to support this conclusory and unfounded assertion. The voir dire of the venire panels, which covered approximately 1,750 pages of the transcript, was extensive and thorough. Those veniremembers who, during questioning of each panel, indicated any specific familiarity with the case were questioned individually. Those veniremembers who could remember details about the crime either were struck for cause or were allowed to remain on the venire because they assured the court that they would not be prejudiced in any way by their knowledge of the case. A review of the other responses of the veniremembers who were not excused and to whom Hardy is presumably referring by the pages cited, shows that each assured the court that he or she would set aside any information gained by any pretrial publicity and render a verdict solely on the evidence presented at trial.
The burden of proof is on the defendant to "show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried." Rule 10.1(b), Ala. R.Crim.P. Hardy failed to meet this burden. "Rather, he has simply made bare allegations that there was prejudicial pretrial publicity and that this publicity biased the jurors" and thus "did not show that he could not receive a fair trial." Hyde v. State, 778 So.2d 199, 232 (Ala.Crim.App. 1998). See also Henderson v. State, 612 So.2d 1256, 1258 (Ala.Crim.App.1992) ("A bare allegation is not sufficient to prove *294 that the defendant was actually prejudiced or that the community was so saturated with prejudicial publicity as to render the trial setting inherently suspect."); Callahan v. State, 557 So.2d at 1306 ("Having produced no evidence, Callahan failed to demonstrate any prejudice, or even that pretrial publicity actually existed, and the trial court properly denied his motion on that ground."). The trial court did not abuse its discretion in denying Hardy's motion for a change of venue.

XIII.
Hardy next contends that the qualified venire, from which his jury was drawn, was impermissibly small. This argument is based on his asserted premise that Ala.R.Crim.P. 18.4, setting out the procedure for selecting a jury, is silent on the number of veniremembers to be added to the venire for each additional defendant tried in a joint capital trial. However, this is not the case.
The pertinent portion of Rule 18.4 states:
"(1) In general. After voir dire examination of the prospective jurors has been completed and challenges for cause have been exercised, the court shall cause to be compiled a list of names of prospective jurors who are competent to try the defendant, from which list the jury shall be obtained. If, in compiling the list, names of qualified prospective jurors are omitted, such omissions shall be made on a nondiscriminatory basis. Unless the parties consent to the use of a lesser number, the number of names appearing upon the list shall be not less than:
"(i) Thirty-six (36), if the offense charged is punishable by death;
". . . .
"(2) Two or more defendants. If two (2) or more persons are being tried jointly, to the minimum number of names otherwise required for striking there shall be added twelve (12) additional names for each additional defendant; provided, there shall then also be added so many additional names as may be necessary to allow all defendants an equal number of strikes...."
(Emphasis added.)
We do not see a need to apply a strained interpretation to Rule 18.4(2), as Hardy asks; the rule is clear on its face. Reading 18.4(1) and (2) in pari materia, as we must, it is plain that for each additional defendant, 12 jurors are to be added to the 36 jurors required when the offense charged is punishable by death.
Hardy's contention in this regard is without merit.

XIV.
Hardy claims that, during the sentencing phase, it was a violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights for the prosecution to rely upon the robbery both as an element of capital murder and as an aggravating circumstance, and that as a result of the "double counting" of robbery, he was subjected to two punishments. This practice of double counting has been upheld. Burton v. State, 651 So.2d 641 (Ala.Crim.App. 1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995). See also Hagood v. State, 777 So.2d 162 (Ala.Crim.App.1998).
"Clearly, § 13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not ... punish a defendant twice. Kuenzel...."
*295 651 So.2d at 657-58. Thus, the appellant's contention is without merit. Having held that the jury's consideration of the robbery as an aggravating circumstance was proper, we also hold that, contrary to Hardy's assertion, the use of robbery as an aggravating circumstance did not result in an arbitrary imposition of the death penalty. See Williams v. State, 710 So.2d 1276 (Ala. Crim.App.1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).

XV.
Hardy contends Alabama's manner of executionelectrocutionconstitutes cruel and unusual punishment in violation of the Eighth Amendment.
"The United States Supreme Court addressed the death by electrocution issue in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In determining what constitutes cruel and unusual punishments, the Court stated: `Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there is something inhuman and barbarous,something more than the mere extinguishment of life.' Id. at 447[, 10 S.Ct. 930]. In holding that such a punishment is not cruel or unusual, the Court reasoned `that this act was passed in the effort to devise a more humane method of reaching the result.' Id. Accord Spinkellink v. Wainwright, 578 F.2d 582, 616 (5th Cir.1978). Appellant's contention is therefore without merit; death by electrocution does not amount to cruel and unusual punishment per se, but is a constitutional means of imposing a sentence of death."
Jackson v. State, 516 So.2d 726, 737 (Ala. Crim.App.1985), remanded on other grounds, 516 So.2d 768 (Ala.1986).
Hardy also contends that Alabama uses inadequate equipment and unqualified personnel, and that Alabama's methods and equipment have resulted in "body charring and electrical burns to the backs, thighs, arms, and abdomens of condemned prisoners" as evidenced by the executions of Horace Dunkins, Michael Lindsey, and Wayne Ritter.
"The very issues raised by appellant here were addressed in Ritter v. Smith, 568 F.Supp. 1499 (S.D.Ala.1983), aff'd in part, rev'd in unrelated part, 726 F.2d 1505 (11th Cir.), cert. denied, 469 U.S. 869, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984), wherein the court adopted the opinion and views expressed by Judge Sam C. Pointer after a hearing on the issues, in Raines v. Smith, No. 83-1080-S (N.D.Ala.[1983]) (unpublished order entered June 3, 1983) (certified copy attached as Appendix, Ritter v. Smith, 568 F.Supp. at 1525-27). The claims presented to Judge Pointer were as follows: (1) given the nature of the equipment and the procedures used, there was unnecessary and wanton infliction of pain and suffering upon persons subject to electrocution in Alabama; (2) the equipment and method involve an unreliable method of execution; and (3) electrocution involves, in its method and equipment, a mutilation of the body which should be viewed as contrary to and violative of the Eighth Amendment. Id. at 1525-26.
"After an evidentiary hearing, Judge Pointer held that the claims were due to be dismissed. Id. at 1527.... Judge Pointer relied upon Francis v. Resweber, [329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947),] and In re Kemmler in holding that Alabama's method of electrocution is constitutional. Id. at 1526-27. We agree.

*296 "There is no evidence before this court that contradicts the findings made by Judge Pointer. There has been absolutely no showing that the State's method of enforcing a death sentence inflicts any more pain than is absolutely necessary."
Jackson, 516 So.2d at 737-38.
Therefore, this issue has been decided adversely to Hardy.

XVI.
Hardy contends that the cumulative effect of the alleged errors enumerated in his brief to this court violated his rights to due process and to a fair trial under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments and entitles him to a new trial. We do not agree. We have reviewed each and every allegation and have found no error. We have also reviewed all of his alleged errors collectively, and still find no error or violation of Hardy's rights.

XVII.
In accordance with Ala.R.App.P. 45A, we have examined the record in this case for any plain error, whether or not brought to our attention or to the attention of the trial court. We have found no plain error or defect in the proceedings, either in the guilt phase or in the sentencing phases of the trial.
We have also reviewed Hardy's sentence pursuant to § 13A-5-53, which requires that, in addition to reviewing the proceedings for any error involving the conviction, we shall also review the propriety of the death sentence. This review shall include a determination of the following: (1) whether any error adversely affecting Hardy's rights was made in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in this case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and Hardy.
After Hardy was convicted of the capital offense charged, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46. After hearing evidence concerning aggravating and mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly advised as to its function in finding aggravating and mitigating circumstances, to the weighing of those circumstances and to its responsibility in reference to the return of an advisory verdict; the jury, by a vote of 10-2, returned the following verdict: "We the jury recommend that the defendant, John Milton Hardy ... be punished by death." (R. 3946.)
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, to determine whether it would follow the jury's recommendation and sentence Hardy to death or sentence him to life imprisonment without the possibility of parole. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b), and complied with the provisions of said section. After the hearing, the trial court entered specific written findings concerning the existence *297 or nonexistence of each aggravating circumstance enumerated in § 13A-5-49 and the existence or nonexistence of any mitigating circumstance enumerated in § 13A-5-51. It also made specific written findings as to the existence of additional mitigating circumstances referred to in § 13A-5-52. It also made written findings of fact summarizing the crime and Hardy's participation in it. In its findings of fact, the trial court found the existence of the following aggravating circumstances: (1) that the capital offense was committed while Hardy was engaged in the commission of a robbery, § 13A-5-49(4); and (2) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A-5-49(8). The trial court examined the evidence for mitigating circumstances, pursuant to § 135-51, and found the existence of two: that Hardy has no significant history of prior criminal activity, § 13A-5-51(1), and his age at the time of the crime, § 13A-5-51(7). In finding Hardy's age to be a mitigating circumstance, the trial court noted that because he was 22 years old at the time the crime was committed, the court gave it very little weight in determining the appropriate punishment to impose. The trial court also examined the evidence for additional mitigating circumstances referred to in § 13A-5-52, and found the existence of one: that Hardy had no children, was not married, and had a father, mother, and four siblings. It noted in its order that it gave very little weight to this mitigating circumstance in determining the appropriate punishment.
Thus, the trial court found the existence of two aggravating circumstances and three mitigating circumstances. It considered the presentence report along with the advisory verdict of the jury and weighed the aggravating circumstances against the mitigating circumstances, and finding that the aggravating circumstances outweighed the mitigating circumstances, sentenced Hardy to death.
Hardy was convicted of the offense of murder committed during a robbery in the first degree, § 13A-5-40(a)(2). This offense is defined by statute as a capital offense. We take judicial notice that similar crimes are being punished capitally throughout this state. See, e.g., McNair v. State, 706 So.2d 828 (Ala.Crim. App.1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998); Henderson v. State, 583 So.2d 276 (Ala. Crim.App.1990), aff'd, 583 So.2d 305 (Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). In fact, two-thirds of Alabama's death sentences have been imposed on defendants convicted of capital murder arising out of robbery-murder. McNair v. State.
We have carefully searched the record of both the guilt and the sentence phases of Hardy's trial, and we have found no error warranting reversal. In reviewing the sentence, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. The trial court's findings and conclusions in support of the death sentence are supported by the evidence in the record. Furthermore, our independent weighing of the aggravating circumstances and the mitigating circumstances convinces us that death is the appropriate sentence in this case; therefore, we concur in the trial court's judgment. Considering the crime committed and considering Hardy, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
*298 Accordingly, Hardy's conviction and sentence of death are due to be, and they are hereby, affirmed.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala.Code 1975.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, BASCHAB, and FRY, JJ., concur.
NOTES
[1] John Milton Hardy, alias John Milton Newton
[2] The trial court's statement, in reading its sentencing order at the sentencing hearing, that this circumstance "does not" exist is obviously a misstatement. (R. 4012.) The written order states that this circumstance does exist. (CR. 32.) Furthermore, in both instances, the finding is followed by the court's observation that despite the finding, "this circumstance is entitled to very little weight."
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] "Rule 701 permits the admission of opinion testimony from a lay witness only where the witness's opinions are `(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.' Fed.R.Evid. 701." United States v. Pierce, 136 F.3d 770, 773 (11th Cir.), cert. denied, 525 U.S. 974, 119 S.Ct. 430, 142 L.Ed.2d 350 (1998).
[5] As noted in Charles W. Gamble, McElroy's Alabama Evidence § 127.01(2) (5th ed.1996):

"The Alabama Rules of Evidence contain an opinion rule [Ala.R.Evid. 701] that, at least on its face, differs significantly from that known to preexisting Alabama practice and one that promises to be more generous toward the admission of lay opinions. Under traditional Alabama law, the determinative inquiry consists of whether the witness can lay all the facts before the jurors such as to place them in as good a position, as the witness is in, to reach an opinion or draw a conclusion. If the answer to this inquiry is `yes' then the opinion is precluded while a negative answer results in admission based upon the theory that, at least in the latter instance, the witness is in a better position than the jury to arrive at an opinion. Stated differently, if the witness' testimony is related to a matter about which he or she cannot lay all the facts before the jury, then the opinion is allowed. In contrast, the Alabama Rules of Evidence Rules change the inquiry to one of whether the witness' opinion, when rationally based upon personal perception, will be helpful in the following described ways:
"Rule 701. Opinion Testimony by Lay Witnesses
"If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."
(Footnotes omitted.)
[6] In determining whether the facts establish that each identification witness possessed sufficiently relevant familiarity with Hardy that the jury could not also possess, we have considered the witnesses' testimony in the suppression hearing as well as their testimony before the jury. We have included the facts elicited in the hearing because we are confronted with the question of the admissibility of the identification testimony, not the weight given that testimony.
[7] We note that the corresponding Kentucky statute is virtually identical. Ky.Rev.Stat. Ann. § 440.280 (Michie 1985), states the following:

"The arrest of a person may be lawfully made also by any peace officer or a private person, without a warrant upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one (1) year...."
This statute continues in its entirety as follows:
"but when so arrested the accused must be taken before a judge with all practicable speed and complaint must be made against him under oath setting forth the ground for the arrest as in the preceding section; and thereafter his answer shall be heard as if he had been arrested on a warrant."
We find this portion of the statute inconsequential here because Hardy was returned to Alabama rather quickly after he voluntarily waived extradition.
[8] Rule 45A, Ala.R.App.P., reads:

"In all cases in which the death penalty has been imposed, the court of criminal appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."